**The STATE of Texas, Appellant,**

v.

**Benny Lee SKILES, Appellee.**

**No. 433–94.**

Court of Criminal Appeals of Texas, En Banc.

Jan. 29, 1997.

Patricia A. Myers, Jacksboro, for appellant.

Michael A. Klein, Asst. Dist. Atty., Fort Worth, Matthew Paul, Asst. State's Attorney, Austin, Matthew Paul, State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

McCORMICK, Presiding Judge.

Appellee was arrested and charged with driving while intoxicated (DWI). Appellee filed a motion to suppress evidence obtained as the result of an unreasonable search and seizure in violation of the Fourth Amendment to the United States Constitution and Article I, Section 9 of the Texas Constitution. The trial court granted appellee's motion, finding that the actions of the police officers constituted "a roadblock." The State appealed and the Second Court of Appeals affirmed, *State v. Skiles,* 870 S.W.2d 341 (Tex. App.—Fort Worth 1994, pet. filed), holding that "the trial judge had sufficient evidence to conclude that the police action was a traffic checkpoint" in violation of appellee's Fourth Amendment rights. The Tarrant County District Attorney and the State Prosecuting Attorney (collectively, "the State") filed petitions for discretionary review raising the following grounds for review: (1) the actions of the police officers did not constitute a roadblock; and (2) the appellee was not "seized" prior to the moment the officers observed him commit a traffic violation.

### I.

On Sunday, January 5, 1992, at approximately 2:00 a.m., Officer Tim Holzschuh of the Fort Worth Police Department was on duty in the Stockyards area of north Fort Worth. Officer Holzschuh was working the traffic detail, the midnight shift (10:00 p.m.—6:00 a.m.). The Stockyards area is a well-known tourist center with a high volume of traffic flow, and several nightclubs. This high concentration of traffic is exacerbated on weekends as a result of people "cruising" in circles around the Stockyards and the adjacent streets (the cruising was concentrated around North Main, Ellis, 25th, 24th, and 23rd Streets). The high volume of vehicles on the streets in this small area led to "stop and go" traffic as the streets became clogged with vehicles. This area was also considered a high-crime area, with murders, assaults, accidents, and other alcohol related incidents taking place there (especially around the area of an alley just off the 100 block of 24th

Street). The heavy traffic also aggravated the crime problem, as most of the shootings in this area were "drive-by" types.

The police determined that in order to decrease the incidents of violence that were taking place in this area adjacent to the Stockyards the traffic flow needed to be increased, and therefore the cruising needed to be stopped. In order to discourage the cruisers from concentrating in the area, the police adopted a two-step approach: (1) temporarily transforming the 100 block of 24th Street from a two-way into a one-way street; and (2) establishing a visible police presence and enforcing the traffic laws by ticketing for all observed traffic violations. The Fort Worth Police also completely closed Exchange Street to all traffic.

In order to have the traffic go temporarily in only one direction, Officer Holzschuh put out traffic cones on each end of the 100 block of 24th Street (where it intersected Ellis and North Main). This shut down the westbound lane but not the eastbound lane. The result was that persons coming off Ellis had free access to 24th Street and could continue to travel eastbound, but persons coming off Main (attempting to travel west) could not enter onto 24th.

Five or six police officers positioned themselves along a well-lighted, forty yard stretch of 24th Street in order to watch for traffic violations. Three or four other officers were also present in that block to handle non-traffic offenses, such as fights and muggings. The blocked off area gave the officers a protected area to stand and view the traffic (the police had conducted similar operations before without the cones and had been dangerously exposed to oncoming traffic). When the officers observed a violation, they would direct the vehicle out of the flow of traffic, either to the north or south side of 24th Street, and issue a citation. No motorist was detained unless and until the officers observed the motorist commit a traffic violation. Nothing that the officers did restricted the eastbound traffic on 24th Street. The only time that the traffic was stopped was when the flow was backed up from vehicles trying to enter Main Street, or when the officers would stop the traffic in order to let

pedestrians cross 24th Street. Apparently this approach worked because by 2:00 a.m., the traffic flow had dissolved from heavy to light, with the cruisers moving to streets located further south.

At approximately 2:00 a.m., Officer Holzschuh observed appellee turn off of Ellis Street onto 24th Street, traveling eastbound toward North Main. Officer Holzschuh was standing at the west end of the 100 block of 24th Street, behind the cones in the westbound lane, near Ellis Street. He also observed that appellee was not wearing a seat belt. Officer Holzschuh walked toward appellee's car as it was coming toward him, held up his hand, and yelled for him to stop. Appellee did not stop and continued driving east down 24th Street. Officer Holzschuh signaled to the other officers (also on foot patrol) further down the street to stop appellee's vehicle. The other officers attempted to stop appellee by yelling, waving their hands, and shining their flashlights at him. Appellee would not stop until finally an officer ran along side the vehicle and pounded on the trunk. He was directed to pull over to the south side curb of 24th Street. Officer Holzschuh was summoned by the other officers, and walked down 24th Street to where appellee was being detained. He determined that appellee was intoxicated and arrested him for DWI.

## II.

### A.

At the pretrial hearing on appellee's motion to suppress, the State presented evidence through the testimony of Officer Holzschuh. At the conclusion of the officer's testimony, the trial court made the following factual findings:

"I'll find that on January 5th, 1992, . . . [Officer Holzschuh] while working the midnight shift, at about 2:00 a.m., in the stockyards area of north Fort Worth, in a very high traffic flow area where cruising abounded, the cruisers circled around the area, there were lots of accidents, murders, it was a high crime area, and quoting the officer: "We were enforcing the traffic laws to get people to stay out of the area.

We were writing tickets. We blocked the north portion of 24th Street with cones ... to discourage traffic and cruising down 24th Street in this area." The officer observed the Defendant's car enter 24th Street proceeding east.... The officer was out there with about five or six other officers. The officer observed that the Defendant didn't have a seat belt on; told him to stop. He didn't stop immediately. He hollered at the other officers to stop him. They did."

The court granted the defendant's motion to suppress by ruling: "I think I'll let the State reverse me this time. I'm going to find *it is a roadblock*. It violates the Fourth Amendment to the United States Constitution and Article 9 of the Texas Constitution." (Emphasis added). However, the trial court also found that everything Officer Holzschuh testified to was truthful and that he observed the defendant not wearing his seat belt, a violation of the law that was committed in the officer's presence, which would authorize the officer to stop the defendant.

### B.

■ The Second Court of Appeals concluded that the police officers were conducting a sobriety checkpoint. *Skiles*, 870 S.W.2d at 343. They found that the high concentration of drinking establishments in the area and the time period that the officers were present suggested that enforcement of the DWI laws may have been the motive for their actions. *Id.* The Court stated: "[B]y blocking one lane of traffic, and positioning a number of officers along that single lane of slow moving traffic, it would not have been necessary to completely stop traffic to perform the observation functions of a *sobriety checkpoint.*" *Id.* (Emphasis added). The Court of Appeals finally held that there was sufficient evidence to conclude that the police action was a "traffic checkpoint" and affirmed the trial court's suppression order.[1] *Id.*

### III.

At a suppression hearing, the trial judge is the sole trier of fact and judge of the credibility of the witnesses, as well as the weight to be given their testimony. *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Cr.App.1990). In considering the trial court's ruling, an appellate court does not engage in its own factual review but decides whether the trial judge's fact findings are supported by the record. *Id.* In making that determination, the appellate court must consider the totality of the circumstances and may not disturb the trial court's findings absent an abuse of discretion. *Dancy v. State*, 728 S.W.2d 772, 777 (Tex.Cr.App.1987), cert. denied, 484 U.S. 975, 108 S.Ct. 485, 98 L.Ed.2d 484 (1987). If the findings of fact are supported by the record, the only question is whether the trial court improperly applied the law to the facts. *Romero*, 800 S.W.2d at 543. Even if the Court of Appeals would have reached a different result, as long as the trial court's rulings are at least within the "zone of reasonable disagreement," the appellate court should not intercede. *Dubose v. State*, 915 S.W.2d 493, (Tex.Cr.App.1996).

Normally, we defer to the factual findings of the courts of appeals when reviewing their decisions. *Arcila v. State*, 834 S.W.2d 357 (Tex.Cr.App.1992); *Esteves v. State*, 849 S.W.2d 822, 824 (Tex.Cr.App.1993). As long as it appears that they have discharged their duty conscientiously by impartial application of pertinent legal doctrine and fair consideration of the evidence, it is our duty in turn to respect their judgments. *Arcila*, 834 S.W.2d at 360. However, when the courts of appeals fail fairly to address the issues raised on appeal, fail to evaluate those issues according to settled rules of law, or fail to reach a conclusion adequately supported by the law and the evidence, no deference is accorded their decisions. *Id.* at 361; *Esteves*, 849 S.W.2d at 824–25 (failing to consider all the relevant evidence); *Delrio v. State*, 840 S.W.2d 443, 447 n. 7 (Tex.Cr.App.1992) (failing to apply the full extent of the controlling legal precedent).

1. The Court of Appeals based its holding solely on the Fourth Amendment to the U.S. Constitution and did not address appellee's argument as to Article I, Section 9 of the Texas Constitution.

## IV.

A thorough examination of the record reveals that there is insufficient evidence to support a legal conclusion that the actions of the police officers constituted a "roadblock" and the record is void of any evidence to determine that there was a sobriety checkpoint. The record evidence shows that the officers took no direct action requiring appellee or any other motorists to slow down or stop; the traffic conditions alone did that—the very same traffic conditions that the officers were attempting to alleviate and which would have been present even if the officers had not been there. Officer Holzschuh testified to this fact on direct examination by the prosecution:

"Q. Okay. Talking about eastbound traffic on 24th Street, is there anything that you did or that anybody else did that would restrict the flow of traffic on 24th Street?

"A. No. No.

* * *

"Q. Okay. At any time did the flow from west to east, did that stop?

"A. The only time it stopped was when the traffic backed up trying to cross Main Street.

"Q. Okay. So, nothing that you did would—would—these cones that you placed out there—

"A. No. We pulled violators out of the flow into the center of the roadway.

"Q. Okay. So, did you do anything—Did you do anything to stop that flow of traffic?

"A. No. The object was to get the traffic to flow."

On cross-examination, defense counsel attempted to get Officer Holzschuh to admit that the actions of the officers restricted the flow of traffic:

"Q. Now, Officer, you also testified that nothing you were doing was restricting traffic on 24th Street. Now that's just not a true statement, is it?

"A. No, I didn't say it exactly like that.

* * *

"Q. Because, obviously, if you've got six officers out there in 40 yards with flashlights, looking in cars, and stopping people, and pulling people over, y'all are restricting traffic, aren't you?

"A. Well, we had to."

If one were to stop reading at this point, it would appear that the officer was testifying that their mere presence restricted the traffic flow.[2] However, if one continues reading, in the subsequent few lines Officer Holzschuh explains his answer:

"A. Because you've got people trying to cross the street in the alley going to their cars."

On re-direct, the prosecutor allowed Officer Holzschuh to further explain his testimony:

"Q. ... Is there anything that you did to stop the west to east traffic?

"A. Not permanent. What I mean by that is that if pedestrians were trying to cross, we would hold up traffic to let the pedestrians cross, and when I needed to take a violator out of the flow, of course, we has to slow them down and pull them over."

Defense counsel, on re-cross, attempted again and failed to have the witness admit that their actions restricted the flow of traffic:

"Q. ... I mean, you're not trying to represent to this Court that it was just a smooth flow through there and y'all aren't even getting in the way, are you?

"A. I just told you on the last question what was going on. When traffic backed up, the kids were cutting up with us."

Certainly, the trial court cannot have it both ways—if Officer Holzschuh is truthful

---

2. Apparently, that is exactly what the Court of Appeals did because there is no evidence in the record to support their assertion that "[t]he officer admitted that their actions necessarily did restrict traffic." *Skiles*, 870 S.W.2d at 342. The record contains no such admission.

and credible, as the trial judge explicitly found, then there is no evidence that the actions of the Fort Worth Police Department constituted a roadblock. The record shows that the only times that the traffic flow was restricted was when the traffic trying to cross Main Street backed up, when pedestrians attempting to cross 24th Street were assisted by the officers, and when observed traffic violators were themselves directed to pull over.[3] The goal was to increase traffic flow, not to restrict it. There is no evidence that the actions of the police unlawfully slowed, stopped, or interfered with the traffic at all. The only evidence in the record is that the traffic flow was congested by the "cruisers," as it would be on any regular weekend night. Nevertheless, Officer Holzschuh further testified that by the time appellant entered onto 24th Street at 2:00 a.m., the traffic had cleared, due both to the actions of the police officers and the regular progression of the traffic.

"Q. [Defense Counsel]: ... I mean at times these cars are just bumper-to-bumper all the way down here.

"A. If you're specifically talking about right then, no, but earlier in the day, yes.

"Q. Well, at 2:00 in the morning even. Two and 2:15, there are tons—

"A. No. See, they all—they all stopped cruising. They all went down to 23rd because we were on 24th. They kept getting tickets and they didn't want to come back by."

\* \* \*

"Q. Because there were cars right in front of him [the defendant], weren't there?

"A. No. At that time it was getting light. I don't mean daylight. I mean, light as in traffic wasn't flowing as heavy. Because during the night, say, 10:00 o'clock, the whole street is stop and go."

There is nothing in the record to show that appellee's ability to travel on 24th Street was restricted in any way. Any attempt to characterize the officers' actions as some sort of ominous presence, slowing the traffic to a complete stop and thereby interfering with the drivers' liberty by merely being present is completely unsupported by the record, as are any references to sobriety checkpoints.

Neither the trial court nor the appellate court's rulings are supported by the record, nor are they within the zone of reasonable disagreement. Appellee presented no evidence, and the evidence supporting the legality of Officer Holzschuh's actions is uncontradicted, uncontroverted, and not in conflict with any other evidence. Absent a finding that the officer's testimony was not truthful, the record does not support the courts' judgments. The record clearly shows that there was no roadblock, de facto, de jure or otherwise, and a contrary finding is an abuse of discretion under both *Arcila* and *Esteves.* We hold there is no evidence to support either court's finding of the existence of a "roadblock."

## V.

■ Let us assume, arguendo, that the officers' actions constituted a roadblock. The presence or absence of a roadblock is an interesting topic of discussion, but in the end only tangentially relevant. The Fourth Amendment protects the right of the people to be free from unreasonable *seizures,* not unreasonable roadblocks. United States Constitution, Amendment IV. A roadblock existing in isolation means nothing, and only becomes constitutionally relevant if because of the law enforcement activity the driver's liberty is sufficiently interfered with to constitute a "seizure."[4]

## A.

A person is "seized" within the meaning of the Fourth Amendment only when that person has been subjected to either application

---

**3.** "The foremost method of enforcing traffic and vehicle safety regulations, it must be recalled, is acting upon *observed violations.*" *Delaware v. Prouse,* 440 U.S. 648, 659, 99 S.Ct. 1391, 1399, 59 L.Ed.2d 660, 671 (1979). (Emphasis added).

**4.** It should be noted that nowhere in the trial court's findings or in the appellate court's analysis is the word "seizure" to be found.

of physical force or, where that is absent, submission to the assertion of authority. *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).[5] Neither the trial court nor the Court of Appeals addressed whether the officers' actions constituted a "seizure" of passing motorists within the teaching of *Hodari D.* and the published opinion of the Court of Appeals is clearly in direct conflict with that bright line rule.

Appellee was not "seized" until *after* Officer Holzschuh observed him commit a traffic violation, providing him with the requisite probable cause.[6] The officers' activity *prior to* their observation of appellee's violation of the law did not amount to a Fourth Amendment seizure of any vehicle, much less appellee's. Their efforts to monitor and control traffic did not subject motorists to the application of physical force or cause motorists to submit to an assertion of authority.[7]

When Officer Holzschuh did assert his authority and instructed appellee to pull over (after observing him driving without a seat belt), appellee, far from submitting, ignored him and continued driving down 24th Street. Furthermore, when the other officers asserted their authority by yelling, waiving their hands, and shining their flashlights in attempting to stop appellee, he continued to refuse to submit. Appellee did not ultimately submit to the officers' assertion of authority until one of them had run along side appellee's moving vehicle and pounded on the trunk. The mere fact that the officers employed methods which facilitated their efforts to monitor the traffic did not constitute a Fourth Amendment "seizure" of those motorists absent the application of physical force or submission to an assertion of authority.

The appellate court's reference to the "observation functions" of a sobriety checkpoint is puzzling. *Skiles*, 870 S.W.2d at 343. The dangers of checkpoints and roadblocks to be guarded against are not their visual "observation" functions, but their potential unreasonable restriction of a person's liberty. *See Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 450, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990); *United States v. Mendenhall*, 446 U.S. 544, 552, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980); *Delaware v. Prouse*, 440 U.S. 648, 650, 99 S.Ct. 1391, 1394, 59 L.Ed.2d 660 (1979). It is inconceivable that someone could be "visually seized." An unreasonable observation or "search" of the appellee, and any resulting intrusion upon a reasonable expectation of privacy is not at issue in this case. *See* 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* Section 2.1(a) at 379 (3d ed. 1996) (hereinafter LaFave).

## B.

A "seizure of the person" by law enforcement is normally unreasonable only if not supported by individualized suspicion, i.e., reasonable suspicion or probable cause. In *Sitz*, the Supreme Court approved the *suspicionless* seizure of drivers at a roadblock for the investigation of the offense of driving while intoxicated.[8] However, in order for the suspicionless seizures to be reasonable, the Court held that the roadblocks must be con-

5. *Cf. Johnson v. State,* 912 S.W.2d 227 (Tex.Cr. App.1995) (adopting the definition of "seizure" under the Fourth Amendment in *Hodari D.* for Art. I, Sec. 9 of the Texas Constitution).

6. Failure to wear a seat belt is a traffic offense. Tex.Rev.Civ.Stat.Ann. Article 6701d, Section 107A (Vernon Supp.1993) (now found in Tex. Transp.Code Ann. Section 545.413 (West 1996)); *Soto v. State,* 810 S.W.2d 861, 863 (Tex.App.-Fort Worth 1991, pet. ref'd).

7. "It quite logically follows that whenever an officer directs a vehicle to stop, and in response it does stop, he has thereby "seized" the occupant, for *the stop* inevitably restrains that person's freedom of movement." 4 Wayne R. La-Fave, *Search and Seizure: A Treatise on the Fourth Amendment* Sec. 10.8(a) at 668 (3d ed.

1996). (Emphasis added). *See also Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (stating that a Fourth Amendment "seizure" occurs when a vehicle is *stopped* at a checkpoint).

8. "Suspicionless" means that "those officers will have no basis whatsoever for believing that any particular driver has committed any offense; the driver is seized because he comes within a category consisting of drivers who are passing the point at which the roadblock is set up during the time when the roadblock is operational." 40 George E. Dix. & Robert O. Dawson, *Criminal Practice and Procedure* Section 10.11 (Texas Practice 1995) (hereinafter Dix & Dawson).

ducted according to established guidelines and procedures.[9] This protected motorists by minimizing the risk of abuse of discretion by officers that the court found unacceptable with the random suspicionless stops in *Prouse.*

Often, however, the initial stop made in connection with the operation of a roadblock will be justified because of a prior, independent reasonable suspicion. 4 LaFave, Section 10.8(a) at 681. In those cases, the constitutionality of the roadblock is irrelevant because the "seizure" of the motorist is based on a prior and independent source and therefore, the exclusionary rule has no application. *Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) (detailing the independent source doctrine); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). *See also* Frank W. Miller et al., *The Police Function* 37 (5th ed. 1991) (stating that obviously, evidence obtained by law enforcement officers *before* they violated a defendant's rights is not the "fruit" of that violation and hence not subject to challenge); 4 LaFave, Section 10.8(a) at 668 n. 15 (explaining that a driver approaching a roadblock is not "seized" until actually reaching the roadblock and thus his actions at that point may constitute independent reasonable suspicion without regard to the lawfulness of the roadblock). Examples of prior independent reasonable suspicion are: (1) when the vehicle fails to stop at the roadblock. *Green v. State,* 530 So.2d 480 (Fla. Dist.Ct.App.1988), rev. denied, 539 So.2d 475 (Fla.1989) (holding that even though roadblock was illegal, motorist's detention for failing to stop his vehicle when directed to do so was valid); *City of Las Cruces v. Betancourt,* 105 N.M. 655, 735 P.2d 1161 (App.1987) (holding that regardless of the constitutionality of the roadblock, officers possessed sufficient articulable facts to seize the driver when the driver proceeded through the roadblock at a high rate of speed without stopping); (2) when the vehicle stops and the driver and passenger change places just before reaching the roadblock. *State v. Giessinger,* 235 Neb. 140, 454 N.W.2d 289 (1990) (regardless of the legality of the roadblock, driver's actions provided a basis independent of the roadblock which justified his stop); (3) or when the vehicle avoids the roadblock in a suspicious manner. *Coffman v. State,* 26 Ark.App. 45, 759 S.W.2d 573 (1988) (holding that an unlawful roadblock will not infect, because of the fruit-of-the-poisonous-tree doctrine, the validity of a motorist's arrest when the motorist reverses direction in order to avoid the roadblock); *Tims v. State,* 26 Ark.App. 102, 760 S.W.2d 78 (1988), modified on other grounds, 26 Ark.App. 102, 770 S.W.2d 211 (1989) (attempt to avoid roadblock gave officers reasonable suspicion regardless of the constitutionality of the roadblock); *State v. Binion,* 900 S.W.2d 702 (Tenn.Crim.App.1994) (motorist acting to avoid roadblock by itself constitutes reasonable suspicion despite officers not adhering to the regulations for operating the roadblock); *Stroud v. Commonwealth,* 6 Va.App. 633, 370 S.E.2d 721 (1988) (constitutionality of roadblock immaterial to motorist's detention where motorist reverses direction in an attempt to avoid the roadblock).[10]

Texas courts have also recognized that the actions of motorists may give officers reasonable suspicion or probable cause prior to and independent of an illegal roadblock. *Murphy v. State,* 864 S.W.2d 70 (Tex.App.-Tyler 1992, pet. ref'd.) (Onion, J., presiding) (holding that even if roadblock was illegal the officer's observation of motorist and passenger switching places before entering the roadblock gave rise to reasonable suspicion justifying the stop); *Johnson v. State,* 833

---

**9.** This Court held in *Holt v. State,* 887 S.W.2d 16 (Tex.Cr.App.1994), that in order to pass federal constitutional muster, these guidelines and procedures must be authorized by a statewide policy emanating from a politically accountable governing body. This presumably, though unclearly, suggests that at least some legislative action is necessary. 40 Dix & Dawson, Section 10.11 at 433. *Contra State v. Sanchez,* 856 S.W.2d 166 (Tex.Cr.App.1993).

**10.** *See Smith v. State,* 515 So.2d 149 (Ala.Crim. App.1987); *Snyder v. State,* 538 N.E.2d 961 (Ind. Ct.App.1989); *Steinbeck v. Commonwealth,* 862 S.W.2d 912 (Ky.Ct.App.1993); *Boches v. State,* 506 So.2d 254 (Miss.1987); *State v. Thill,* 474 N.W.2d 86 (S.D.1991). For the contrary and minority view, see *Pooler v. Motor Vehicles Div.,* 88 Or.App. 475, 746 P.2d 716 (1987), aff'd. 306 Or. 47, 755 P.2d 701 (1988); *State v. Talbot,* 792 P.2d 489 (Utah App.1990).

S.W.2d 320 (Tex.App.—Fort Worth 1992, pet. ref'd.) (holding that even if the roadblock is improper, officers may use evidence concerning a motorist's reaction to the roadblock to justify a detention or arrest). *See also Holt v. State,* 887 S.W.2d 16, 17 n. 1 (Tex.Cr.App. 1994) (noting that witnessing the switch by the two persons inside the vehicle may give rise to independent reasonable suspicion in certain circumstances). Roadblocks are only a constitutional concern because they involve suspicionless seizures. Again, let us assume arguendo that the actions of the Fort Worth police officers constituted a roadblock and were therefore unconstitutional under *Holt.* Even if we further assume that they set up a full-fledged roadblock that morning with patrol cars, flares, lights, signs and stopped every single vehicle that drove down 24th Street, there is no violation of the Fourth Amendment until someone is seized without the requisite probable cause or reasonable suspicion. The testimony of Officer Holzschuh reveals the sequence of events that occurred as follows:

"Q. [Prosecutor]: Okay. You said you observed the car coming off of Ellis, and you can't remember if it was northbound or southbound, make a turn on to 24th Street?

"A. Yes.

"Q. Okay. And which way was it travelling whenever it turned on to 24th Street?

"A. It went eastbound on 24th."

\* \* \*

"Q. Okay. And what did you notice about the car that was unusual?

"A. I observed the driver not wearing a seatbelt, and went to make a traffic stop."

\* \* \*

"Q. Okay. What did you do after you observed that the driver didn't have his safety belt on?

"A. *I walked towards the car as it was coming towards me,* held up my hand, and yelled for the driver to stop.

"Q. Okay.

"A. Tried to get the driver's attention.

"Q. Okay. And what did the driver do?

"A. He kept driving. He didn't stop." (Emphasis added).

Officer Holzschuh was located at the farthest end of the officers' position on 24th Street, and the first possible officer that appellee could have encountered. When appellee turned onto 24th Street, he was not delayed by any slow moving or backed up traffic, that having already dissolved. The record reveals that appellee committed a traffic offense in plain view of Officer Holzschuh *before* reaching the officer's position and *before* being seized (within the meaning of *Hodari D.*) by the other officers. That is to say, appellee's actions provided a basis independent of the so-called roadblock which justified his detention and arrest, and we need not even reach the validity of any alleged roadblock. This case should be analyzed under standard Fourth Amendment doctrine, without any reference whatsoever to *Sitz* or sobriety checkpoints. It has been miscast from the beginning, and the various participants apparently beguiled by the presence of both traffic control devices and the ultimate DWI charge. Put simply, this is not a "roadblock" type case. This case does not involve a suspicionless seizure at an unconstitutional roadblock.

Based on the foregoing, we reverse the judgment of the Court of Appeals and the order of the trial court granting appellant's suppression motion, and we remand this case to the trial court for further proceedings consistent with this opinion.

MEYERS, J., I concur in Parts I through IV of the lead opinion, but dissent to Part V of the opinion in that I believe that portion to be dicta.

OVERSTREET, J., dissents.

BAIRD, Judge, concurring and dissenting.

I concur in parts I through IV of the majority opinion because I agree there is no evidence to support the trial judge's finding of a roadblock. *Ante;* 938 S.W.2d at 452. However, believing the remainder of the

opinion is totally unnecessary to the resolution of the instant case and, therefore, advisory, I dissent to part V of the majority opinion. *Ante*, 938 S.W.2d at 452–55.

An advisory opinion is one which "adjudicates nothing, and is binding on no one." *Douglas Oil Co. v. State*, 81 S.W.2d 1064, 1077 (Tex.Civ.App.1935). Consequently, this Court has consistently refrained from issuing advisory opinions. *Garrett v. State*, 749 S.W.2d 784, 803 (Tex.Cr.App.1986) (opinion on rehearing); *Gonzales v. State*, 864 S.W.2d 522, 523 (Tex.Cr.App.1993) (Baird, J., concurring). *See also, Woolridge v. State*, 827 S.W.2d 900, 905 (1992) (*Dictum* is not binding); *Wiltz v. State*, 863 S.W.2d 463, 466–68 (Tex.Cr.App.1993) (Miller, BAIRD, and Overstreet, JJ., concurring); *and, Gordon v. State*, 801 S.W.2d 899, 917 (Tex.Cr.App.1990) (Baird, J., concurring).

Part V of the majority opinion is nothing more than *obiter dictum*.[1] The majority acknowledges this by beginning part V with:

> Let us *assume, arguendo*, that the officers' actions constituted a roadblock. The presence or absence of a roadblock is *an interesting topic of discussion*, but in the end is *only tangentially relevant.*

*Ante*, 938 S.W.2d at 452 (emphasis added). This is obviously dictum, because part IV of the majority opinion concludes by *holding* "there is no evidence to support either [the trial court's or the Court of Appeals'] finding of the existence of a 'roadblock.'" *Ibid.*

Because part V of the majority opinion is wholly advisory, I respectfully dissent to that portion of the majority opinion. Accordingly, I join only the judgment of the Court.

---

1. Obiter dictum is defined as:
   Words of an opinion *entirely unnecessary for the decision of the case.* ... A remark made, or opinion expressed, by a judge, in his decision upon a cause, "by the way," that is, incidentally or collaterally, and not directly upon the question before him, or *upon a point not necessarily involved in the determination of the cause,* or introduced by way of illustration, or analogy or argument. Such are not binding as precedent.
   Blacks Law Dictionary, 6th Ed., p. 1072 (emphasis added).