965 S.W.2d 523 (1997)
Jamie Humberto MUÑERA, Appellant,
v.
The STATE of Texas, Appellee.
No. 14-94-01013-CR.
Court of Appeals of Texas, Houston (14th Dist.).
August 28, 1997.
Rehearing Overruled October 9, 1997.
Discretionary Review Refused March 11, 1998.
*525 Mary Samaan, Judith M. Prince, Houston, for appellant.
Kevin Patrick Yeary, Houston, for appellee.
Before YATES, HUDSON and FOWLER, JJ.

OPINION ON MOTION FOR REHEARING
YATES, Justice.
This appeal requires us to determine whether the trial court erred in denying appellant's motion to suppress because the arresting officers did not have reasonable suspicion to justify the detention of the appellant at a train station. Because we believe the officers did not have reasonable suspicion, we reverse the judgment of the trial court.

Background
Appellant was arrested and charged with possession of more than 400 grams of cocaine with the intent to deliver. On the day of his arrest, Officers Rodriguez, Gann, Hebert, and Mitchell, experienced narcotics interdiction officers, were assigned to the Amtrack train station in Houston. The officers were monitoring a particular train heading for Chicago, a well-known "demand" city for narcotics.
Rodriguez observed an individual, later identified as appellant, standing in line to check a bag. After checking in one bag, he walked away with a duffel bag. Leaving his duffel bag inside, appellant left the lobby and stepped outside to smoke a cigarette. Rodriguez noticed that appellant turned to look inside the lobby while he was smoking the cigarette. After smoking his cigarette, appellant *526 retrieved his duffel bag and walked towards a bench. He first scanned the lobby and then placed his duffel bag on the end of a bench. Afterward, he sat on the other end of the bench, some ten feet away.
Appellant did not stand up when his train's departure was announced. Rodriguez noticed that appellant was observing the officers from the corner of his eyes. He decided to approach and question appellant. Rodriguez identified himself as a police officer, and appellant agreed to talk to him. Hebert was standing a few feet behind Rodriguez while Gann and Mitchell were about twenty to forty feet from Rodriguez. However, Rodriguez found it necessary to speak in Spanish because appellant's English was very poor. Appellant remained very nervous throughout the encounter. Rodriguez asked for appellant's ticket and driver's license. After examining appellant's California driver's license, Rodriguez returned it to appellant. The ticket contained the same name as on appellant's license, and it reflected it was purchased with cash on that day. When asked where he lived, appellant explained he had been in Houston for several days visiting his mother and that he was returning to Chicago.
Rodriguez then asked appellant if he had any baggage. Appellant pointed and stated he had only one bag, the duffel bag. Rodriguez knew appellant had checked in a bag, having observed him do so earlier and seeing the baggage claim stub attached to the ticket. Rodriguez then informed appellant that he was a narcotics officer conducting a narcotics interview. In response to Rodriguez's questions, appellant denied that he was carrying narcotics, and he agreed to allow Rodriguez to look in his duffel bag. Although the parties dispute this point, Rodriguez testified that he informed appellant he did not have to allow any search and could leave at any time. Rodriguez searched the duffel bag, but found nothing incriminating within.
Rodriguez then asked Hebert to retrieve the bag appellant had checked in. Appellant told Rodriguez that his bag was black, and Rodriguez went to convey this information to Hebert. Before doing so, Rodriguez told appellant he could board the train and the officers would bring his baggage claim stub. Gann remained with appellant until Rodriguez returned with the bag. The bag was locked, but the officers opened it with a key found in appellant's jeans. Inside the bag, the officers found several black garbage bags, filled with a substance that field tested positive for cocaine.
Appellant pled not guilty to the court. He filed a motion to suppress that was carried with the case. The trial court denied the motion to suppress with no specific explanation other than that it heard the evidence, demeanor, and manner of each witness testifying. At the conclusion of the case, the trial court found appellant guilty and sentenced him to twenty-five years confinement in the Texas Department of Criminal Justice, Institutional Division and assessed a $100,000 fine. This appeal followed.

Standard of Review
In his sole point of error, appellant contends the trial court erred in denying his motion to suppress the evidence.[1] In a motion to suppress, the trial court is the sole and exclusive trier of fact. Romero v. State, 800 S.W.2d 539, 543 (Tex.Crim.App.1990). We will reverse the trial court's decision only for an abuse of discretionwhen it appears the trial court applied an erroneous legal standard, or when no reasonable view of the record could support the trial court's conclusion under the correct law and the facts viewed in the light most favorable to its legal conclusion. DuBose v. State, 915 S.W.2d 493, 497-98 (Tex.Crim.App.1996). Even if we would reach a different result, as long as the trial court rulings are at least within the "zone of reasonable disagreement," we will not intercede. Id. at 496. Furthermore, should the trial judge's determination be correct on any theory of law applicable to the case, it will be sustained. Romero, 800 S.W.2d at 543.

*527 Analysis

When was appellant detained?
We begin our analysis of appellant's point of error by determining at what point appellant was "detained" for constitutional purposes. An investigatory detention is a "seizure" of the citizen. Johnson v. State, 912 S.W.2d 227, 235 (Tex.Crim.App.1995) (plurality opinion). A seizure occurs when a person has been subjected to either the application of physical force or the person submits to the assertion of authority. State v. Skiles, 938 S.W.2d 447, 453 (Tex.Crim.App. 1997); Johnson, 912 S.W.2d at 235.
An investigatory detention is distinct from an "encounter," which is not a seizure. Johnson, 912 S.W.2d at 235. During an encounter, an officer is free to approach the individual and ask questions, but the individual is free to ignore the officer and walk away. Id. The confrontation remains an encounter until a reasonable person would believe he or she was not free to leave and the person has yielded to the officer's show of authority or been physically forced to yield. Id.; see also Francis v. State, 922 S.W.2d 176, 178 (Tex.Crim.App.1996) (Baird, J., concurring and dissenting). Each case must be decided by an examination of the "totality of the circumstances surrounding the encounter." Peterson v. State, 857 S.W.2d 927, 930 (Tex.App.-Houston [1st Dist.] 1993, no pet.).
Appellant contends that after Rodriguez asked for appellant's ticket, the encounter was transformed into an investigatory detention. Appellant argues he was not free to leave because Rodriguez retained control over his ticket.[2] Neither Rodriguez nor appellant was specifically asked if Rodriguez kept the ticket at the hearing, but the record does support appellant's version of that fact. Rodriguez testified he returned appellant's driver's license, but he did not testify that he returned the ticket. After he searched the duffel bag, Rodriguez gave the baggage claim stub to Hebert. The most reasonable inference is that Rodriguez kept the ticket in his possession throughout the encounter.
Appellant also claims that Rodriguez's request to search his luggage converted the encounter into a detention. Even if the request to search appellant's bags alone did not convert the encounter into a detention,[3] we find that Rodriguez's request, in conjunction *528 with the other surrounding circumstances, did convert the encounter into a detention. Rodriguez asked to examine appellant's ticket and did not return the ticket to him. Appellant was surrounded by four officers, although two of the officers were twenty to forty feet away. He then asked appellant for his consent to search his carry-on baggage to which appellant agreed. Even though the record shows that Rodriguez told appellant he was free to leave, we find that a reasonable person in appellant's position would not feel free to leave and that appellant had yielded to Rodriguez's show of authority. Johnson, 912 S.W.2d at 235. Accordingly, we conclude that appellant was detained.

Did appellant consent?
Appellant's bags were searched without a search warrant and without probable cause. Therefore, the validity of the search turns on appellant's purported consent to search the bags. The State must prove, by clear and convincing evidence, that appellant's consent was freely and voluntarily given. DuBose v. State, 915 S.W.2d 493, 496 (Tex.Crim.App.1996). The extent of the search is limited to the scope of the consent granted. Id.
Appellant contends the officers exceeded the scope of the consent that appellant granted. First, appellant testified that Rodriguez asked if "he could look" in the duffel bag. He testified he understood the difference between looking and touching. However, the scope of consent is measured by what the typical person would have understood by the exchange between the officer and the individual. Id. Thus, even if Rodriguez only asked for permission to "look," an objectively reasonable interpretation of that request would allow the officer to search through the bag.
Appellant also claims that he only gave consent to search the duffel bagnot the checked-in bag. He also testified that Rodriguez pulled the key to the lock on that bag out of his pocket. There is some conflict in the record on this issue. Rodriguez testified appellant rummaged through his duffel bag to find the key, but could not find one. Then he stated, "[Appellant] then started to kind of fumble through his pockets, which we found one in his change pocket of the right side of his pants pocket of his jeans." This might suggest the officers reached into his pocket to retrieve the key. However, when the State asked who reached for the key, Rodriguez testified that appellant pulled it out after he was asked if the bulge in his pocket might be the key. Hebert also testified appellant pulled the key out of his pocket. More importantly, Rodriguez earlier testified that appellant gave permission to search both bags. Despite appellant's claim that he never gave such permission, we conclude the trial court could have reasonably concluded appellant did give permission to search the checked-in bag.

Did the officers have reasonable suspicion?
At the time appellant was detained, which we have determined occurred when the officers requested consent to search appellant's bags, the officers needed reasonable suspicion to justify their detention. During an investigative detention, the police are allowed to briefly question a suspicious person about his identity, his reason for being in the area, and to make similar reasonable inquires of a truly investigatory nature. Amores v. State, 816 S.W.2d 407, 412 (Tex.Crim.App.1991) (plurality opinion). To do so, the officer must have specific articulable facts that, in light of his experience and general knowledge and reasonable inferences from the facts, would reasonably justify the intrusion on the citizen. Gurrola v. State, 877 S.W.2d 300, 302 (Tex.Crim.App.1994). Reasonable suspicion is more than a hunch, but less than proof of wrongdoing by a preponderance of the evidence. Holladay, 805 S.W.2d at 469. It requires reasonable suspicion by the officer that 1) some activity out of the ordinary is occurring or had occurred, 2) some suggestion to connect the detained person with the unusual activity, and 3) some indication that the activity is related to crime. Gurrola, 877 S.W.2d at 302; Hoag v. State, 728 S.W.2d 375, 380 (Tex.Crim.App. 1987). "At a minimum, however, the suspicious conduct relied upon by law enforcement officers must be sufficiently distinguishable from that of innocent people under the same *529 circumstances as to clearly, if not conclusively, set the suspect apart from them." Crockett v. State, 803 S.W.2d 308, 311 (Tex.Crim. App.1991).
We begin by examining the individual circumstances relied upon by the officers to determine if reasonable suspicion existed to detain appellant. We note as a preliminary matter that many of the individual factors relied upon by the State have been rejected in other cases in the past. Further, in its brief, the State concedes that none of the factors are individually sufficient to provide reasonable suspicion of criminal conduct.
1. Chicago is a demand city
The State relies on evidence of appellant's destination to a "demand" city. Appellant purchased a one-way ticket to Chicago. Rodriguez testified that Chicago is a well-known demand area for drugs and that narcotics couriers "like to use that route." However, the fact that appellant is traveling to Chicago does not in any way distinguish him from any of the other passengers en route to Chicago. See Daniels v. State, 718 S.W.2d 702, 705 (Tex.Crim.App.1986) (appellant's arrival from a source city does not distinguish him from the other passengers on the flight), explicitly overruled on limited grounds, Juarez v. State, 758 S.W.2d 772, 780 n. 3 (Tex.Crim.App.1988).[4] The United States Supreme Court has concluded that departure to a source city is "not a cause for any sort of suspicion." United States v. Sokolow, 490 U.S. 1, 9, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1 (1989) (emphasis added).[5]
2. Appellant bought his train ticket in cash
The State also notes appellant's ticket was purchased in cash. However, the State did not establish that drug dealers make cash purchases more frequently than do other people. See Crockett, 803 S.W.2d at 312. Nor did the State establish the price of the ticket or whether the ticket was purchased in small or large bills. Even under more developed and suspicious circumstances, payment in cash has been considered consistent with innocent activity. In Sokolow, the defendant paid for two round trip airplane tickets, worth $2100, in twenty dollar bills. Sokolow, 490 U.S. at 8, 109 S.Ct. at 1586. The Supreme Court concluded such activity is out of the ordinary, but it was still consistent with innocent travel. Id. at 9, 109 S.Ct. at 1586. Appellant's activity in this case is not as "out of the ordinary" as the defendant's in Sokolow, and it could not have provided a basis for reasonable suspicion.
3. Appellant's handling of his duffel bag
Appellant left his duffel bag inside the lobby while he smoked a cigarette, and he left the duffel bag on the other end of the bench he sat upon. It is very unclear how this relates to criminal activity.[6] In fact, Rodriguez testified that these actions did not raise his suspicions; they were just unusual and captured his attention. Furthermore, if these facts formed a basis for reasonable suspicion, it should have dissipated after they searched the duffel bag and found nothing. The officer could not have reasonably relied on appellant's actions with his duffel bag to justify suspicion that he was carrying narcotics in his checked-in bag.
4. Appellant remained seated during the departing announcement
Rodriguez testified that appellant remained seated after the departure announcement was given, informing the passengers the train would leave in ten to fifteen minutes. Appellant did not turn around to watch the passengers boarding, rather, he looked straight ahead. This is completely consistent with innocent travel activity. Appellant might have deliberately waited to board, to allow other passengers to board *530 first or to avoid being enclosed in the small cabins for as long as possible before a long trip. Appellant also suggests his poor understanding of English would also explain that he did not stand up because he did not understand the departure call.
5. Appellant had a California license but was traveling to Chicago
After Rodriguez asked appellant if he lived in Chicago or Houston, appellant replied that he had been in Houston for several days visiting his mother and that he was traveling to Chicago. Appellant's conduct was consistent with innocent travel activity. Rodriguez may have lived in California, but he could have been traveling to Chicago for any number of reasons. (This might also explain why appellant purchased a one-way tickethe could have been making a three-way trip from California, through Houston, to Chicago). It was also possible that he currently lived in Chicago, but still had his California license. These explanations are consistent with innocent activity. It is also significant that Rodriguez did not ask a follow up question regarding whether appellant actually lived in Chicago or California after he learned appellant had a California license.
6. Appellant misrepresented the number of his bags
Rodriguez testified that he asked appellant if he had "any baggage." Appellant replied "by pointing and stating that it was just one bag." Rodriguez realized immediately that appellant's answer was incorrect because he saw appellant check in a bag and because the baggage claim stub on the ticket indicated he checked-in a bag. After Rodriguez stated that he was a narcotics officers, he asked appellant "how many bags he had." At that time, appellant stated he had checked in one bag in addition to the duffel bag next to him.
In his brief, appellant includes a detailed discussion of the various interpretations of Rodriguez's questions in Spanish. He contends that the regional differences in the Spanish dialect, as well as the translation from Spanish to English, proves that appellant truthfully answered the questions asked of him. However, this explanation is not contained in the record. Although the record does reflect that Rodriguez had to speak to appellant in Spanish, Rodriguez also testified that appellant did not answer his question correctly.
Even without this explanation, it is questionable whether Rodriguez could have reasonably relied on appellant's answer as evidence of an inconsistency or a lie. If appellant was attempting to hide the fact that he owned another bag, he did "a very poor job of it" given that his baggage claim stub was attached to the ticket he had just handed Rodriguez. Daniels, 718 S.W.2d at 705. His conduct was consistent with an innocent traveler, who, surprised and nervous by the officer's interruption, interprets the question do you have "any" bags, as "do you have any bags with you?" Furthermore, a single inconsistency does not indicate evidence of drug trafficking. See Montano v. State, 843 S.W.2d 579, 583 (Tex.Crim.App.1992) (inconsistency in the traveler's destination does not indicate drug trafficking); Daniels, 718 S.W.2d at 707 (even if appellant was lying about whether he was traveling with another individual, it was not a reasonable ground to conclude his activity was criminal).
7. Appellant was extremely nervous
The record clearly shows that appellant was nervous. Rodriguez noticed that appellant made a number of furtive eye movements while he was smoking his cigarette and before he sat down inside the lobby. Rodriguez further testified that when he first approached him, appellant was "extremely nervous" and "extremely excited." Appellant was breathing heavily, and his facial expressions showed that he was extremely nervous. He was nervous even after Rodriguez began speaking to him in Spanish. When appellant gave Rodriguez his train ticket, his hands were shaking. Gann also testified that appellant was extremely nervous before Rodriguez spoke to him. He characterized appellant as a "[r]eal rigid type" because he did not make "unnecessary" movements and he looked out of the corners of his eyes instead of turning his head completely. When Rodriguez *531 approached him, appellant "just stiffened up." Hebert testified that appellant's voice was "quivering" during the encounter with Rodriguez. Appellant even testified that he was "somewhat nervous," but he did not recall that his hands were shaking.
The officers also testified they believed that nervousness could indicate evidence of drug trafficking. Rodriguez testified that although the initial encounter with an officer in plain clothes might make the average person nervous, the same person would relax after the officer identifies himself as a police officer. In contrast, he testified that narcotics traffickers have a tendency to "escalate their nervous level" after an officer identifies himself. Gann testified that anybody in a train station is nervous to a certain extent, but that "we have found over the years that a narcotics courier exhibits more nervousness, more looking around than the normal passengers."
However, the officers also gave testimony suggesting nervousness alone is not reliable evidence of criminal activity. Gann admitted that people could be nervous for a number of reasons unrelated to illegal activity. Hebert testified that he doubted whether shaky hands alone would indicate that the person is trafficking narcotics.
Despite the officer's beliefs, the law states that appellant's nervousness is not a reasonable grounds for suspicion. The Court of Criminal Appeals has held that furtive eye movements furnish "no basis" for suspicion of criminal activity. Daniels, 718 S.W.2d at 705. Moreover, "[i]t is not beyond the norm for an innocent person to appear nervous if detained and questioned by police officers." Montano, 843 S.W.2d at 583. Nervousness when confronted by an officer can support either innocence or guilt because many people react nervously when they are approached by police. Daniels, 718 S.W.2d at 707; see also Holladay, 805 S.W.2d at 472-73 (nervousness alone does not support a finding of reasonable suspicion because it is consistent with innocent activity).
8. The totality of the circumstances
Having concluded that none of the factors listed above were sufficient to support a finding of reasonable suspicion, we now determine whether the factors, when considered "in toto," are sufficient to authorize a reasonable suspicion of criminal activity. See Sokolow, 490 U.S. at 9, 109 S.Ct. at 1586; Holladay, 805 S.W.2d at 473. We conduct this review even though this analysis has not consistently been performed by the Court of Criminal Appeals. Compare Holladay, 805 S.W.2d at 473 (finding all the factors considered in the totality of the circumstances were sufficient to authorize a reasonable suspicion of wrongdoing), with Montano, 843 S.W.2d at 583 (finding a lack of reasonable suspicion without a totality of the circumstances analysis); Crockett, 803 S.W.2d at 313 (same); Daniels, 718 S.W.2d at 707 (same).
In contrast to the type of evidence which has been found to constitute a reasonable suspicion, the officers here did not have a tip or informant that would raise the officers suspicions that appellant was trafficking drugs. The record reflects that appellant was dressed like other passengers and that the name on his ticket matched the name on his identification. There was nothing unusual about appellant's itinerary. Appellant did not attempt to flee when confronted by the officers. Other than nervousness, appellant did not act in an unusual manner. He did not lie about his destination, his name, or whether he was traveling with or was associated with another person. Finally, Rodriguez testified that typically drug couriers tend to arrive and purchase a ticket at the last minute in order to avoid detection by narcotics officers. He also admitted that since appellant arrived approximately twenty-five minutes before boarding, he did not match this typical behavior.
Under the totality of the circumstances, in conjunction with the factors detailed above, the officer's experience simply does not amount to reasonable suspicion. As the Court of Criminal Appeals stated in Crockett:
The behavior upon which the investigating officers here relied may have seemed odd to them. But that is not the issue. Appellant's demeanor must have been indicative of drug trafficking in particular, not merely of eccentricity. It must have been of such character as to justify an involuntary investigatory detention of all persons exhibiting it.
*532 Crockett, 803 S.W.2d at 313. The officers did not have specific articulable facts that would allow them to suspect appellant's activity was related to crime, as opposed to innocent conduct.

Did the lack of reasonable suspicion taint the subsequent search?
Concluding that the officers did not have sufficient reasonable suspicion to justify the detention does not end our analysis. We must now determine whether the lack of reasonable suspicion tainted the consent of the subsequent search. See Juarez v. State, 758 S.W.2d 772, 780 (Tex.Crim.App.1988) ("[T]here is no per se rule prohibiting the use of evidence obtained as a result of a consent search following an illegal arrest, stop or detention."), overruled on other grounds, Boyle v. State, 820 S.W.2d 122, 131-32 (Tex. Crim.App.1989).
To permit the admission of any evidence discovered from a search after an illegal stop, the State has the burden to show, by clear and convincing evidence, the taint of the illegal detention is too attenuated to also taint the consent to search. Boyle v. State, 820 S.W.2d 122, 131-32 (Tex.Crim.App. 1989), cert. denied, 503 U.S. 921, 112 S.Ct. 1297, 117 L.Ed.2d 520 (1992). The factors we must consider include whether appellant received Miranda warnings or was made aware he could decline the search, the temporal proximity of the consent to search to the illegal detention including the presence of intervening circumstances, whether the consent was volunteered rather than requested, and the purpose and flagrancy of the official misconduct. Id. at 131-33.
As to the first factor, Rodriguez indicated that he repeatedly told appellant he was free to leave. However, the record does not reflect that appellant was aware he could refuse the search of his checked-in bag. Instead, the record reflects that appellant was given permission to board the train and that Rodriguez would later bring the baggage claim stub to him. It is also clear appellant was not given Miranda warnings before his checked-in bag was searched.
As to the temporal element, we have already determined that the officer's request to search converted the encounter into a detention. As such, it would be difficult to conclude the temporal proximity between the detention and the search would remove the taint. The search of appellant's bag flowed directly from his illegal detention. It is also evident that appellant's consent was requested rather than volunteered.
However, we do not conclude that the prime purpose of the detention was to obtain the consensual search, nor can we conclude this case "reeks with a quality of purposefulness." Id. at 133. The record does not support such a conclusion.
Nevertheless, reaching such a conclusion does not suggest that the State has met its burden to show, by clear and convincing evidence, that the taint of the illegal stop was removed from the consent to search. We conclude the State has not met its burden.

Conclusion
We find that the officers did not have reasonable suspicion to detain appellant. The illegal detention tainted appellant's consent to search. Because the officers did not have reasonable suspicion, the trial court erred in refusing to grant appellant's motion to suppress. We reverse the judgment of the trial court and remand the case for further proceedings consistent with this opinion.
NOTES
[1] Appellant brings this point of error under Article I, Section 9 of the Texas Constitution and Article 38.23 of the Texas Code of Criminal Procedure.
[2] The retention of the baggage claim stub raises an issue as to whether appellant's checked in bag was "seized." See Crockett v. State, 803 S.W.2d 308, 310 n. 6 (Tex.Crim.App.1991). Rodriguez testified that after the duffel bag was searched, he informed appellant he could board the train and he would return his baggage claim stub to him. However, because this issue of "seizure" is not before us, we will not address it.
[3] The Court of Criminal Appeals has held that a request for permission to search an individual's luggage converts an initial encounter into an investigatory detention. Holladay v. State, 805 S.W.2d 464, 472 (Tex.Crim.App.1991); see also State v. Hamlin, 871 S.W.2d 790, 793 (Tex. App.-Houston [14th Dist.] 1994, pet. ref'd). However, more recently, a plurality of the Court of Criminal Appeals stated, "[a] law enforcement officer is permitted to approach a citizen without reasonable suspicion or probable cause in order to ask questions and even to request a consent to search." Johnson, 912 S.W.2d at 235 (emphasis added); see also Dean v. State, 938 S.W.2d 764, 769 (Tex.App.-Houston [14th Dist.] 1997, no pet. h.) (following Johnson).

It would appear that the emphasized statement in Johnson is contrary to the Court's earlier reasoning in Holladay. However, Johnson is merely a plurality opinion and does not overrule Holladay. This Court has expressed displeasure with the holding in Holladay in the past. See Hill v. State, 951 S.W.2d 244 (Tex.App.-Houston [14th Dist.] 1997, no pet. h.) (op. on reh'g.) (questioning the validity of Holladay in light of Florida v. Bostick, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)); Hamlin, 871 S.W.2d at 794 ("[B]ecause we are bound by the prior decisions of the Court of Criminal Appeals, we reluctantly affirm the trial court's decision [to grant the appellant's motion to suppress]"); id. (Draughn, J., dissenting) ("In sum, I would hope that the Court of Criminal Appeals would re-visit Holladay and conclude that the mere requesting of permission to search without more does not automatically constitute either a seizure or an investigatory detention of the person, to whom the request is directed."). There is also some dispute as to whether Holladay creates a per se detention rule. Compare Hamlin, 871 S.W.2d at 793 ("In light of Holladay, we hold that Appellee was detained at the time Officer Luiz requested permission to search his bag.") with Peterson v. State, 857 S.W.2d 927, 930 (Tex.App.-Houston [1st Dist.] 1993, no pet.) ("There is no per se rule as to when police questioning amounts to a detention."). We would again urge the Court of Criminal Appeals to review this issue and clarify this area of law.
[4] Juarez overruled Daniels only to the extent that Daniels suggested the consent was per se fatally tainted by an illegal stop. See Holladay, 805 S.W.2d 464, 468 n. 4.
[5] The Supreme Court noted that additional circumstances in that case made the round trip tickets from Honolulu to Miami unusual. It stated, "[S]urely few residents of Honolulu travel from that city for 20 hours to spend 48 hours in Miami during the month of July." Id.
[6] Although the State does not rely on this factor in its brief, we address it because the issue was developed in the trial court and the trial court may have relied upon it.