*Clifton Johnson v. State*, No. 1386, September Term 2017
Opinion by Kehoe, J.

**Criminal Procedure: Fourth Amendment: Traffic Checkpoints and "Traffic Initiatives":** A "traffic initiative" conducted by the Baltimore City Police Department was not a traffic checkpoint for Fourth Amendment purposes. In conducting the traffic initiative, the police did not stop every vehicle, or vehicles in a defined sequence, and did not block or restrict traffic in anyway. The police only stopped vehicles whose drivers were not wearing a seat belt or using a cell phone. There was probable cause to stop appellant because an officer saw that he was not wearing his seat belt.

Circuit Court for Baltimore City
Case No.: 116145002

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1386

September Term, 2017

_____

CLIFTON JOHNSON

v.

STATE OF MARYLAND

_____

Meredith,
Kehoe,
Berger,

JJ.
_____

Opinion by Kehoe, J.
_____

Filed: September 9, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

While conducting what the Baltimore Police Department called a "traffic initiative" in downtown Baltimore, members of the Department stopped Clifton Johnson, who was halted at a red light, for failure to wear a seat belt. As a result of that stop, the police discovered an open warrant for Johnson's arrest, as well as a loaded handgun under the driver's seat of the vehicle. Johnson was charged with illegal possession of a regulated firearm, wearing, carrying and transporting a handgun on his person and in a vehicle, possession of ammunition, and operating a vehicle while not wearing a seat belt. Johnson filed a motion to suppress the evidence relating to the handgun, which was denied. A jury of the Circuit Court for Baltimore City convicted Johnson of illegal possession of a regulated firearm, wearing, carrying, and transporting a handgun on his person and in a vehicle, and possession of ammunition. Johnson has appealed his convictions and presents the following question:

> Did the trial court err in denying appellant's motion to suppress because the evidence was discovered as a result of an illegal traffic checkpoint?

We conclude that the traffic initiative in this case does not constitute a "checkpoint" for purposes of the Fourth Amendment, U.S. CONST. amend. IV, and hold that there was no violation of Johnson's Fourth Amendment rights in this case.[1] We will affirm the convictions.

---

[1] Because Johnson does not contend that he is entitled to different or broader protection under Article 26 of the Maryland Declaration of Rights, we consider his claims solely in the context of the Fourth Amendment.

The Traffic Initiative

On May 7, 2016, at around 4:30 or 5:00 p.m., seven officers from the Baltimore City Police Department stationed themselves at the intersection of West Pratt Street and South Payson Street to conduct a traffic initiative in order to find infractions of vehicles pertaining to seatbelts and cell phones. Two of those officers, Officer Zachary Serio and Officer Karl Dauphin, testified at the suppression hearing. Officer Serio was positioned, on foot, near the traffic light, and was looking for drivers halted at the light who were not wearing their seat belts. Officer Serio explained that Pratt Street was a one-way street, travelling east towards the city center, and that traffic was moderate at the time.

When traffic was stopped at the red light, Officer Serio walked in front of or beside vehicles and to see if the occupants were wearing their seat belts or were talking on a cell phone. If the light was green, the officers did not initiate any traffic stops, even if they observed an infraction. Instead, the officers allowed the vehicles to proceed on Pratt Street, unimpeded so as, according to Officer Dauphin, not to "interrupt the traffic." In that way, drivers were stopped only during the red light sequences and the flow of traffic was not adversely affected. Officer Serio testified:

> Q. So can you briefly describe like what exactly you do?
>
> A. Whenever there was a red light and the cars were stationary, I would walk through and see if I could find any drivers of vehicles that were not wearing their seat belts or were on their cell phones at this time.
>
> Q. Okay. And if someone wasn't wearing a seat belt or on their cell phone, what would you do?
>
> A. I would advise them to pull off onto Payson Street where there would be another officer who would go forth and write the citation.

2

Officer Serio testified that there were no places where a car could turn around between those two locations; that there were no signs indicating that the police were conducting a checkpoint; and that this police activity was not advertised in any manner. Additionally, he confirmed that orange traffic cones were located on the side of the street, but only for purposes of officer safety, and were not used in any way to funnel traffic down to one lane. In his testimony, Officer Dauphin clarified that the traffic cones were placed between cars parked on Pratt Street and the curb as a signal to motorists parking their vehicles that officers were present. Officers parked their police cruisers on Payson Street and not on Pratt Street in order to avoid obstructing traffic.

In addition to Officers Serio and Dauphin, there were approximately five other officers at the intersection of Pratt and Payson, and another seven police officers stationed at the preceding signalized intersection west of their location. This second group of officers would alert Officers Serio and Dauphin if they saw someone driving by without a seat belt or while talking on a cell phone.

Officer Serio further testified that all the officers involved were recent graduates of the police academy. Although the initiative was done at the suggestion of a supervisor, no supervisors were present on the street. Further, no drug sniffing dogs were present at either intersection. The initiative ended at around 6:00 or 6:30 p.m.

The Stop of Johnson

Midway through the initiative, at around 5:35 p.m., Johnson stopped his vehicle at the red light located at Pratt and Payson Streets. Officer Serio walked by the driver's side of

3

the vehicle and noticed that Johnson was not wearing his seat belt. Officer Serio told Johnson to pull over to the side of the street to Officer Dauphin's location. Officer Serio then notified Officer Dauphin about his observations.

As Johnson was pulling over, Officer Dauphin ran a check on the vehicle's license plate number. The officer learned that the Maryland Motor Vehicle Administration did not have any record for the license plate that was displayed on Johnson's vehicle. Specifically, the information came back as "No record found."[2]

Officer Dauphin then approached the driver's side of the vehicle, and also observed that Johnson was not wearing a seat belt. Unable to provide his driver's license or the registration for the vehicle, Johnson gave Officer Dauphin his name and date of birth. Using that limited information, Officer Dauphin ascertained that there was a possible open warrant for Johnson. Officer Dauphin stepped to the rear of the vehicle and called in to the Baltimore Police Department "Hot Desk"[3] to confirm Johnson's warrant status. As this was occurring, Officer Serio maintained watch over Johnson and noticed that he "hunched over with his left shoulder" and placed his left hand underneath the driver's seat.

---

[2] There was a vehicle identification number, but the police never ascertained the identity of the vehicle's owner. There was also a female passenger in the vehicle with Johnson, but, at some point, she was allowed to leave the scene.

[3] The "Hot Desk" is the "Unit within the Baltimore Police Department Central Records Section that provides 24 hour service for National Crime Information Center transactions, records information (*e.g.*, police reports), and all communications/administrative messages between law enforcement agencies within the United States and Canada via National Law Enforcement Telecommunications Services (NLETS)" *See* Baltimore Police Department, Policy 1301, National Crime Information Center (June 11, 2017), available at https://www.baltimorepolice.org/1301-national-crime-information-center-ncic.

Officer Dauphin then received confirmation that Johnson was wanted on the open arrest warrant and was advised to take him into custody. Following this confirmation, Johnson was ordered out of the car, handcuffed, and placed under arrest. He was also given a citation for failure to wear a seat belt.

Because there was no license plate record associated with the vehicle and it was, according to Officer Dauphin, "technically illegally [sic] for it to be on the street," the officers determined that the vehicle had to be towed from the scene. Prior to towing the vehicle, the officers conducted an inventory search. During that inventory search, Officer Dauphin found a loaded .357 Smith and Wesson revolver under the front driver's seat. Moreover, Officer Dauphin testified that he saw the handgun on the floor as soon as he opened the driver's side door.

Proceedings in the Circuit Court

Pursuant to Md. Rules 4-252 and 4-253, Johnson filed a motion to suppress the handgun. A hearing was held, at which the court heard the testimony of Officer Serio and Officer Dauphin. At the close of testimony, defense counsel made two arguments. First, counsel asserted that Johnson was stopped at an unlawful checkpoint because the traffic initiative did not satisfy the multi-factor test enunciated in *Little v. State*, 300 Md. 485 (1984), and so did not pass constitutional muster. Second, assuming that the stop was illegal, counsel contended that the discovery of Johnson's arrest warrant did not attenuate the unlawful stop based on the U.S. Supreme Court's analyses in *Brown v. Illinois*, 422 U.S. 590 (1975), and *Utah v. Strieff*, __ U.S. __, 136 S. Ct. 2056 (2016). The State responded that the traffic initiative was not a checkpoint; instead, this was simply a number of police officers making

5

observations inside those vehicles that were halted by a traffic control device. Further, the State argued that the police had probable cause to stop Johnson because, not only was Johnson's vehicle not properly registered, but Johnson also had an open arrest warrant. Therefore, the handgun was discovered through a lawful inventory search.

The motions court agreed with the State, concluding that the traffic initiative was not a checkpoint. The court distinguished the traffic initiative from a checkpoint by finding:

> [A] checkpoint involves stopping a vehicle. Not one vehicle, but stopping every vehicle for the purpose of monitoring something. The testimony in this case is that no one was stopped except if a violation was noted by the them [sic] driving by and then they were directed to pull over and get their ticket. And when they pulled over to get their ticket, their license was run.
>
> This is not a checkpoint case. This is a use of a lot of young bodies and young eyes to observe the street with great particularity driving by a two block period.
>
> But the one person specifically asked, and that was Officer Serio, said if the light was green at what we believe is Smallwood Street and the light was green at Payson Street and you drove by, could you just – just drive by? The answer was yes. You could be clear there in a minute or two. That's not a checkpoint.
>
> In a checkpoint, which cases arise out of literally the – the border stops that were converted into other forms of police investigative techniques, everybody gets stopped. Everybody gets talked to.
>
> * * *
>
> I do not believe that the officers in this case violated anyone's constitutional rights by watching people as they stopped at a red light to see if they had their seat belt on or were foolish enough to be using a cell phone in the presence of a police officer.

Based on those findings, the court ruled that:

> If there's no checkpoint, there's no illegality in the stop, and I will rule as a matter of law the stop did not take place until Mr. Johnson was waved to pull around onto Payson Street and the car came to a halt.

6

It was because Officer Serio had already seen him to be driving without his seatbelt on, that at that time Officer Dauphin – Dauphin ran the license and found reason to engage the Appellant beyond the seatbelt ticket that he did get according to Officer Serio.

\* \* \*

The intrusion was minimal and all addressed specifically for the purpose of handling the traffic situation. As such, I find no violation of the Appellant's Fourth Amendment rights involving the stop and his arrest.

The court then denied the motion to suppress.[4]

After trial, a jury convicted Johnson of illegal possession of a regulated firearm, wearing, carrying, and transporting a handgun on his person and in a vehicle, and possession of ammunition. Johnson was sentenced to eight years for illegal possession of a regulated firearm, the first five without possibility of parole, and concurrent sentences of one year, respectively, on the remaining counts. Johnson timely appealed.

The Standard of Review

Our review of a suppression motion is "limited to the record developed at the suppression hearing." *State v. Johnson*, 458 Md. 519, 532 (2018) (quoting *Moats v. State*, 455 Md. 682, 694 (2017)). The evidence is considered "in the light most favorable to the party who prevails on the motion." *Raynor v. State*, 440 Md. 71, 81 (2014), *cert. denied*, 135 S.Ct. 1509 (2015). The suppression court's factual findings are accepted "unless they are shown to be clearly erroneous." *Id.* Legal questions are considered *de novo* and "where, as here,

---

[4] At the suppression hearing, the State additionally contended that any constitutional infirmity in the stop was attenuated by the subsequent discovery of the open arrest warrant. *See, e.g., Utah v. Strieff,* __ U.S. __, 136 S. Ct. 2056, 2061 (2016); *Sizer v. State*, 456 Md. 350, 375–76 (2017). The motions court did not address this argument and based its ruling entirely on the constitutionality of the initiative.

a party has raised a constitutional challenge to a search or seizure, we must make an independent constitutional evaluation by reviewing the relevant law and applying it to the unique facts and circumstances of the case." *Grant v. State*, 449 Md. 1, 14–15 (2016) (quoting *State v. Wallace*, 372 Md. 137, 144 (2002)); *accord State v. Johnson*, 458 Md. at 532–33.

**Analysis**

Johnson contends that the motions court erred because he was stopped during an unlawful checkpoint. Johnson does not explain *how* the traffic initiative constituted a police checkpoint. Rather, Johnson presumes that the traffic initiative was a checkpoint and focuses his argument on how the "checkpoint" did not pass constitutional muster. He asserts that:

> the checkpoint was not operated under limitations imposed by clear, carefully crafted regulations approved by high level administrators that meaningfully restricted the discretion of officers in the field. Rather, it was haphazardly located on a one-way street, and officers did not place signs at the intersection to indicate their presence. * * * Under these circumstances, the intrusiveness of the checkpoint into motorists' rights was not outweighed by the State's interest in enforcing local traffic laws. Therefore, the checkpoint must be considered constitutionally deficient and any evidence discovered the poisonous fruit of an illegal traffic stop under the Fourth Amendment.

Johnson supports his argument with *Little v. State*, 300 Md. 485 (1984), in which the Court of Appeals identified thirteen factors to consider when determining whether a checkpoint is reasonable under the Fourth Amendment. According to Johnson, an application of those factors to the facts of the present case dictates a finding that the checkpoint was unlawful, and, as a consequence, we must conclude that a violation of Johnson's rights under the Fourth Amendment occurred.

8

The State takes a different approach. It argues that Johnson was not seized by the police at an unlawful checkpoint. In support, the State notes that the police did not stop every vehicle passing through the intersection. Instead, the police stopped only those vehicles committing a traffic violation, and only one vehicle at a time, as all other vehicles were permitted to proceed through the intersection on a green light. These two factors, the State maintains, sets the traffic initiative apart from checkpoints in which all motorists are stopped without reasonable suspicion.

According to the State, the traffic initiative was similar to "any other ordinary traffic stop where a police officer stops a moving vehicle for a traffic violation." Thus, Johnson's failure to wear a seat belt while operating his vehicle provided the police with probable cause to stop Johnson.

We agree with the State that the traffic initiative was not a checkpoint for purposes of the Fourth Amendment's protections against unreasonable searches and seizures. Our analysis consists of three parts. First, we set out some background information and the existing Maryland caselaw. Then, we look at more recent decisions from other jurisdictions, particularly the United States Supreme Court. These cases are instructive because they provide descriptions of traffic checkpoints. From these descriptions, we identify the characteristics of a "checkpoint" for purposes of the Fourth Amendment. Finally, we apply that information to the traffic initiative at issue.

1.

Historically, traffic checkpoint programs that have been found lawful under the Fourth Amendment are "designed primarily to serve purposes closely related to the problems of

policing the border or the necessity of ensuring roadway safety." *Indianapolis v. Edmond*, 531 U.S. 32, 41 (2000). However, when the primary purpose of a checkpoint program "is to uncover evidence of ordinary criminal wrongdoing, the program contravenes the Fourth Amendment." *Indianapolis v. Edmond*, 531 U.S. at 41-42 (concluding that, absent individualized suspicion, a drug interdiction checkpoint was unconstitutional considering that its primary purpose was crime control); *see also Brown v. State*, 78 Md. App. 513, 514 (1989) (characterizing a police blockade of all vehicular and pedestrian travel in a cordoned-off area of Salisbury, for the purpose of obtaining identification, checking for outstanding warrants, and looking for signs of drug trafficking, as "a pre-planned paramilitary operation unparalleled in the annals of this Court or, we hope, of any other court of this State.").

In *Little v. State*, 300 Md. 485 (1984), the Court of Appeals upheld the use of sobriety checkpoints as a means to control drunk driving. 300 Md. at 501. Pursuant to a pilot program, the Maryland State Police erected multiple roadblocks on state roads having a high rate of alcohol-related accidents over the course of seven days, between 11 p.m. and 4 a.m. *Id*. at 489. The pilot program was publicized extensively through press conferences, media coverage, and even a mock checkpoint demonstration. *Id*. Nine uniformed officers were present at every checkpoint site. *Id*. Each site had a sign warning motorists of the checkpoint ahead, provided a safe place for motorists to make a U-turn before the checkpoint, and was illuminated by flares and signs to control traffic. *Id*. at 490–91. Although no barricades were placed in the roadway, State Police vehicles were parked on either side of the roadblock with their emergency lights activated, and an officer signaled traffic to halt with

the use of a flashlight. *Id*. at 491. Pursuant to the checkpoint regulations developed by the State Police, all vehicles approaching the checkpoint were stopped, and each stop lasted between fifteen and thirty seconds. *Id*.

The two appellants in *Little* were stopped at such a checkpoint and arrested after failing several field sobriety tests. *Id*. at 492. Each appellant filed a motion to suppress all evidence obtained as a result of the checkpoint stops, arguing that the stops violated their constitutional rights. *Id*. The circuit court denied the motions and found the appellants guilty of driving while intoxicated. *Id*. at 493. The appellants appealed, challenging the roadblocks as violative of the Fourth Amendment to the federal Constitution and Article 26 of the Maryland Declaration of Rights. *Id*.

The Court of Appeals evaluated the constitutionality of the checkpoint at issue. After analyzing *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), *Delaware v. Prouse*, 440 U.S. 648 (1979), *Texas v. Brown*, 443 U.S. 47 (1979) (discussed *infra*), and cases from other jurisdictions, the Court developed the following factors when considering the reasonableness of a checkpoint:

> (1) The degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration of the roadblock; (4) standards set by superior officers; (5) advance notice to the public at large; (6) advance warning to the individual approaching motorist; (7) maintenance of safety conditions; (8) degree of fear or anxiety generated by the mode of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the location, type and method of operation; (11) the availability of less intrusive methods for combating the problem; (12) the degree of effectiveness of the procedure; and (13) any other relevant circumstances which might bear upon the test.

300 Md. at 501.

11

Applying those factors, the Court held that no Fourth Amendment or Article 26 violation occurred. *Id*. at 504. The State's interest in controlling drunk driving was compelling, the Court concluded, compared to the minimal intrusion upon civil liberties. *Id*. at 505-06. The checkpoints at issue were operated by clear regulations which restricted the discretion of the officers, reducing the risk of police harassment. *Id*. at 506. Fright and annoyance by motorists were also minimal, and drivers were permitted to avoid the checkpoint using the U-turn area. *Id*.

In *Cobey v. State*, 73 Md. App. 233 (1987), this Court held that a "traffic observation checkpoint," in which only cars with obvious traffic violations were stopped, was not illegal. 73 Md. App. at 245-46. In *Cobey*, the Washington, D.C. Police Department established a "traffic observation checkpoint" on Kennedy Street in the District of Columbia. *Id*. at 235. As Cobey approached the traffic observation checkpoint, the police observed that his vehicle failed to display an inspection sticker and front license plate, which are required under District of Columbia law. *Id*. The police ordered Cobey to pull over. *Id*. at 235-36. When a computer check of the license plate number failed to produce any information, the police issued Cobey two traffic tickets, allowed him to leave, and impounded the car. *Id*. at 236. Later, the police arrested Cobey when they discovered the vehicle he had been driving was stolen and linked to a different crime that occurred in Maryland. *Id*. As a result of that investigation, Cobey was eventually convicted of sexual offense, robbery, and related crimes. *Id*. at 237.

Cobey presented three issues on appeal, but only one is pertinent to our analysis: whether the circuit court erred in admitting evidence obtained as a result of an unreasonable traffic roadblock. *Id*. at 237. We held that the circuit court did not err:

> Appellant's assertion that the stop was illegal is grounded on the requirements for a valid roadblock set out in *Little v. State*, 300 Md. 485, 479 A.2d 903 (1984). This reliance is misplaced. Captain William Freeman of the District of Columbia Police testified at appellant's suppression motion hearing that he was in charge of the checkpoint on Kennedy Street on the night appellant was stopped. He explained that it was not a *Little*-type roadblock at which all cars, or every second, third, or fourth car, etc., were stopped. Only cars with obvious violations of the D.C. traffic code were stopped. Thus, there was probable cause to stop every car which was stopped, including that which appellant was driving. The police may pull cars over for routine traffic stops from the roadside just as they may while patrolling the highways. The motion to suppress was properly denied.

*Id*. at 245-46.[5]

Finally, in *Gadson v. State*, 341 Md. 1 (1995), the Court of Appeals held that the detention of the appellant at a prison checkpoint without a reasonable articulable suspicion to do so violated the Fourth Amendment. While driving to the House of Correction in Jessup, the appellant, Gadson, was stopped at a guard booth about one quarter of a mile before the entrance to the prison. 341 Md. at 6. An officer at the booth informed Gadson that he was going to conduct a "canine sniff" of Gadson's vehicle, and ordered Gadson to turn off his vehicle so that he could perform the drug search. *Id*. at 7. Gadson objected, and requested permission from the officer to leave the area. *Id*. The officer denied Gadson's request, conducted the canine sniff, and discovered evidence of drugs in the vehicle. *Id*.

---

[5] We reversed Cobey's convictions on other grounds. 73 Md. App. at 247.

Gadson filed a motion to suppress the evidence of drugs, arguing that he should have been given the option to turn around rather than submit to the drug search. *Id*. The circuit court denied the motion. *Id*. After trial, Gadson was convicted of intent to distribute cocaine and intent to distribute marijuana. *Id*. at 6.

The Court of Appeals granted certiorari to determine "whether [the officer's] detention of Gadson at the guard shack constituted an 'unreasonable seizure' within the meaning of the Fourth Amendment . . . ." *Id*. at 8. It was not disputed that detaining Gadson was a "seizure" under the Fourth Amendment; rather, Gadson's only argument was that his detention violated the Fourth Amendment. *Id*. The State argued that the seizure was reasonable, citing to the "checkpoint" exception discussed in *Little*. *Id*.

The Court of Appeals disagreed with the State, observing that "the reasonableness of a checkpoint detention is determined by balancing the intrusion of the motorist's privacy interests against the societal need served by the seizure." *Id*. at 11. Acknowledging that the State has a strong interest in keeping drugs out of its correctional facilities, the Court concluded that interest was accomplished when Gadson expressed his intention to turn back rather than pass through the checkpoint. *Id*. at 12. Further, the Court concluded (emphasis in original):

> We believe there is a fundamental difference between the seizure in the case *sub judice* and those upheld in the police checkpoint cases relied on by the State. In *Little* and [*Michigan v.*] *Sitz*, [496 U.S. 444 (1990)], the articulated governmental interest was getting drunk drivers off the road. Clearly, if a drunk driver arriving at a sobriety checkpoint were allowed to turn back once arriving at the checkpoint, the State's interest would not be served because the intoxicated motorist would still be a public danger.

\* \* \*

> On the other hand, the governmental interest asserted in the instant case, keeping illegal narcotics out of the House of Correction, *is accomplished* by turning away motorists who decline to submit to the dog sniffing procedures. Once the motorist decides to turn away from the prison, the danger of drugs entering the prison evaporates.

*Id*. at 12–13.

Thus, the Court distinguished the seizure of Gadson at a prison guard booth from constitutionally valid checkpoints, such as the sobriety checkpoint in *Little*, and reversed and remanded to the circuit court. *Id*. at 21.

Next, we turn to checkpoint cases decided by the United States Supreme Court. In *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), the Supreme Court upheld the validity of permanent checkpoints operated by the Border Patrol away from the international border with Mexico. 428 U.S. at 545. The checkpoint was located 66 miles north of the Mexican border along the principal highway between San Diego and Los Angeles. *Id*. The Court described the checkpoint in detail (emphasis added):

> Approximately one mile south of the checkpoint is a large black on yellow sign with flashing yellow lights over the highway stating "*ALL VEHICLES, STOP AHEAD*, 1 MILE." Three-quarters of a mile further north are two black on yellow signs suspended over the highway with flashing lights stating "WATCH FOR BRAKE LIGHTS." At the checkpoint, which is also the location of a State of California weighing station, are two large signs with flashing red lights suspended over the highway. These signs each state "STOP HERE U. S. OFFICERS." Placed on the highway are a number of orange traffic cones funneling traffic into two lanes where a Border Patrol agent in full dress uniform, standing behind a white on red "STOP" sign checks traffic. Blocking traffic in the unused lanes are official U. S. Border Patrol vehicles with flashing red lights. In addition, there is a permanent building which houses the Border Patrol office and temporary detention facilities. There are also floodlights for nighttime operation.

*Id*. at 545–46.

15

There was also evidence presented that the checkpoint was located in an area that restricted vehicles from turning around or otherwise avoiding the checkpoint. *Id.* at 553. As motorists passed through the checkpoint, a patrol agent conducted a visual screening of the vehicles. *Id.* at 546. Most vehicles were allowed to pass through without interruption, but if an agent concluded further inquiry was necessary, he would direct the vehicle to a secondary inspection area where the vehicle's occupants were questioned about their citizenship and immigration status. *Id.* Although the secondary investigation could be based on the agent's suspicion of criminal activity, the government conceded that the three stops at issue in *Martinez-Fuerte* were not based on any reasonable articulable suspicion. *Id.* at 547. On average, an investigation lasted between three and five minutes. *Id.* Ultimately, the Supreme Court declared that "stops for brief questioning routinely conducted at permanent checkpoints are consistent with the Fourth Amendment and need not be authorized by warrant." *Id.* at 565. In doing so, the Court reasoned that "the potential interference with legitimate traffic is minimal" because "[m]otorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere." *Id.* at 559. The Court also looked to the amount of discretion left to officers conducting the checkpoint, and found that "checkpoint operations both appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest." *Id.*

16

In *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444 (1990), the Supreme Court upheld the validity of a sobriety checkpoint. The Michigan State Police created a pilot program to establish sobriety checkpoints, and developed a set of guidelines and procedures governing the checkpoint operation, site selection, and publicity. 496 U.S. at 447. The sobriety checkpoint was operated as follows (emphasis added):

> [C]heckpoints would be set up at selected sites along state roads. *All vehicles passing through a checkpoint would be stopped* and their drivers briefly examined for signs of intoxication. In cases where a checkpoint officer detected signs of intoxication, the motorist would be directed to a location out of the traffic flow where an officer would check the motorist's driver's license and car registration and, if warranted, conduct further sobriety tests. Should the field tests and the officer's observations suggest that the driver was intoxicated, an arrest would be made. All other drivers would be permitted to resume their journey immediately.

> The first—and to date the only—sobriety checkpoint operated under the program was conducted in Saginaw County with the assistance of the Saginaw County Sheriff's Department. During the 75–minute duration of the checkpoint's operation, 126 vehicles passed through the checkpoint. The average delay for each vehicle was approximately 25 seconds. Two drivers were detained for field sobriety testing, and one of the two was arrested for driving under the influence of alcohol. A third driver who drove through without stopping was pulled over by an officer in an observation vehicle and arrested for driving under the influence.

*Id*. at 447-48.

In determining whether the checkpoint violated the Fourth Amendment, the Court weighed the State's interest in curbing "the magnitude of the drunken driving problem" against the intrusion of the motorists stopped at the checkpoint, and concluded that no constitutional violation had occurred. *Id*. at 451.

In *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000), the Supreme Court declared unconstitutional a drug interdiction checkpoint. In 1998, the City of Indianapolis conducted

17

six vehicle checkpoints, stopping a total of 1,161 vehicles and arresting 104 motorists. 531

U.S. at 34-45. At each of the six checkpoint locations (emphasis added):

> the police stop *a predetermined number* of vehicles. Approximately 30 officers are stationed at the checkpoint. Pursuant to written directives issued by the chief of police, at least one officer approaches the vehicle, advises the driver that he or she is being stopped briefly at a drug checkpoint, and asks the driver to produce a license and registration. The officer also looks for signs of impairment and conducts an open-view examination of the vehicle from the outside. A narcotics-detection dog walks around the outside of each stopped vehicle.

*Id*. at 35.

The checkpoints were operated primarily during daylight hours and were identified with lighted signs reading: "NARCOTICS CHECKPOINT ____ MILE AHEAD, NARCOTICS K-9 IN USE, BE PREPARED TO STOP." *Id*. at 35-36. Pursuant to guidelines developed for the checkpoints, police officers were permitted to search a vehicle only by consent or based on a reasonable articulable suspicion of criminal activity. Each initial inspection lasted on average five minutes or less, and all vehicles passing through the checkpoint were subject to inspection. *Id*. at 36. The Court held that this type of checkpoint, one whose primary purpose was to detect evidence of ordinary criminal wrongdoing, violated the Fourth Amendment:

> We have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing. Rather, our checkpoint cases have recognized only limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion. We suggested in [*Delaware v.*] *Prouse* that we would not credit the "general interest in crime control" as justification for a regime of suspicionless stops. 440 U.S. [648], at 659, n.18 Consistent with this suggestion, each of the checkpoint programs that we have approved was designed primarily to serve purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety. Because the primary purpose of the

18

Indianapolis narcotics checkpoint program is to uncover evidence of ordinary criminal wrongdoing, the program contravenes the Fourth Amendment.

531 U.S. at 41–42

In *Illinois v. Lidster*, 540 U.S. 419 (2004), the Supreme Court upheld the validity of a police checkpoint in which the police sought information regarding a recent hit-and-run accident. The police established a checkpoint in the same area and at the same time that a hit-and-run accident occurred, in the hopes of obtaining more information about the incident. 540 U.S. at 422. At the checkpoint, police cars with flashing lights blocked half of the highway, causing oncoming traffic to slow down and back up. *Id*. The police stopped each vehicle for approximately ten to fifteen seconds, asked the occupants a few questions, and hand each driver a flyer that read "ALERT . . . FATAL HIT & RUN ACCIDENT" and requested "ASSISTANCE IN IDENTIFYING THE VEHICLE AND DRIVER IN-VOLVED IN THIS ACCIDENT WHICH KILLED A 70 YEAR OLD BICYCLIST." *Id*. The Court held that because the police were seeking to obtain information "to help find the perpetrator of a specific and known crime," and not looking for violations of general crimes like in *Edmond*, the stops made at the checkpoint were constitutional. *Id*. at 427.

One case from the Texas Court of Criminal Appeals has similarities to the case before us. In *State v. Skiles*, 938 S.W.2d 447 (1997), the Court of Criminal Appeals, *en banc*, held that a group of police officers were not conducting an illegal roadblock by standing in a highly congested area and observing motorists for traffic violations. 938 S.W.2d at 451. At 2:00 a.m. on a Sunday, five or six officers of the Fort Worth Police Department posi-tioned themselves in forty-yard stretch of a highway running through a congested, high-

crime neighborhood. *Id*. at 448-449. The purpose of the police presence was to reduce "cruising" through the neighborhood, which exacerbated the congestion problem. In order to deter cruising, the officers, using traffic cones, blocked one lane of the street, transforming it from a two-way to a one-way street and "establish[ed] a visible police presence and enforcing the traffic laws by ticketing for all observed traffic violations." *Id*. at 449. Officers stood in the blocked area and observed oncoming traffic for violations. *Id*. If a violation was observed, officers directed that vehicle out of traffic to issue the driver a citation and "[n]o motorist was detained unless and until the officers observed the motorist commit a traffic violation." *Id*. Additionally, the officers did not restrict the one-way traffic. *Id*.

The officers observed Skiles driving without wearing a seat belt, and gestured to him to pull over. *Id*. Skiles failed to stop, and after a brief chase, he pulled his vehicle over and was detained. *Id*. The officers determined that Skiles was intoxicated and arrested him for driving while intoxicated. *Id*.

Skiles filed a motion to suppress the evidence, arguing that it was obtained through an unreasonable search and seizure in violation of the Fourth Amendment. *Id*. at 450. The court agreed, ruling: "I'm going to find *it is a roadblock*. It violates the Fourth Amendment to the United States Constitution and Article 9 of the Texas Constitution." *Id*. (emphasis supplied by the Court of Criminal Appeals.). Texas' intermediate appellate court affirmed and concluded that the police officers were conducting an illegal sobriety checkpoint. *Id*. That court reasoned that because of the "high concentration of drinking establishments in the area and the time period that the officers were present suggested that enforcement of the DWI laws may have been the motive for their actions." *Id*.

20

The Texas Court of Criminal Appeals reversed, concluding that "[a] thorough exami-

nation of the record reveals that there is insufficient evidence to support a legal conclusion

that the actions of the police officers constituted a 'roadblock' and the record is void of any

evidence to determine that there was a sobriety checkpoint." 938 S.W.2d at 451. The Court

observed that the officer's testimony at the suppression hearing demonstrated that "the of-

ficers took no direct action requiring [Skiles] or any other motorists to slow down or stop;

the traffic conditions alone did that—the very same traffic conditions that the officers were

attempting to alleviate[.]" *Id*. The Court concluded that there was no checkpoint because:

> There is nothing in the record to show that appellee's ability to travel on 24th
> Street was restricted in any way. Any attempt to characterize the officers'
> actions as some sort of ominous presence, slowing the traffic to a complete
> stop and thereby interfering with the drivers' liberty by merely being present
> is completely unsupported by the record, as are any references to sobriety
> checkpoints.

*Id*. at 452.

Considered together, these decisions indicate that there are characteristics common to

and indicative of police checkpoints. Inherent in all the checkpoints so far described is that

motorists are stopped by the police without having a reasonable articulable suspicion to do

so. Additionally, *every* motorist, or motorists in a predetermined sequence, passing through

the checkpoint is stopped by the police. This is the very hallmark of a checkpoint. This

facet ensures uniformity and consistency with stops of motorists and removes any discre-

tion from the police on whom they stop.

Another characteristic of a checkpoint is the use of a "roadblock." As we have seen

from the checkpoints described herein, a roadblock is often effectuated by the presence of

police vehicles in or adjacent to a highway. As is often the case, the police vehicles have their emergency lights activated. A roadblock can also be effectuated through traffic cones, flares, and other objects that act as barriers to motorists. Together, the roadblock and its component parts serve the purpose of funneling traffic into a limited number of lanes to facilitate easier inspection by police.

Also accompanying checkpoints are signs that serve dual purposes. There are signs to warn motorists that a checkpoint lies ahead, as well as signs that provide motorists with instructions on what to do when they reach the checkpoint.

Finally, at a checkpoint, motorists are subjected to varying degrees of intrusion, depending on the purpose of the checkpoint.

These are characteristics common to all checkpoints. Taken together, the amalgamation of police vehicles blocking a motorist's pathway, emergency lights, barriers, cones, flares, flashing signs, visual inspections, and questioning manifests into a significant police presence that would undoubtedly put an approaching motorist on notice that a checkpoint designed to halt vehicles expressly for the purpose of police inspection lies ahead.

The meaning we have ascertained falls squarely within the common meaning of the term. Black's Law Dictionary defines "checkpoint" as "a roadblock or barrier used to check people and vehicles passing through, as for authorization to enter, security breaches, or law enforcement." BLACK'S LAW DICTIONARY 298 (11th ed. 2019). Similarly, an "information checkpoint" is defined as "a place where police randomly stop vehicles to seek investigative data that might help them locate and apprehend suspects who are not thought to be occupants in the vehicles stopped." BLACK'S LAW DICTIONARY 298 (11th ed. 2019). And

a "sobriety checkpoint," like the checkpoint in *Sitz* and *Little*, is "a part of a roadway where police officers maintain a roadblock to stop vehicles to test drivers for intoxication or the use of illegal drugs." BLACK'S LAW DICTIONARY 1672 (11th Ed. 2019). The commonality among these definitions is that they involve a roadblock. In turn, a roadblock is defined as "a place where traffic is being stopped for any reason, as by law-enforcement officers." BLACK'S LAW DICTIONARY 1591 (11th Ed. 2019).[6] Clearly, these definitions align with our understanding of "checkpoint."

2.

We will now apply these concepts to the traffic initiative at issue here. We conclude that the traffic initiative was not a checkpoint for purposes of the Fourth Amendment.

The hallmark of a checkpoint is that motorists are stopped by the police without the police having a reasonable articulable suspicion to do so. This was not what happened in the present case. At the suppression hearing, Officer Serio testified that motorists were allowed to proceed down Pratt Street, past South Payson Street, when the light was green.

---

[6] The Maryland Transportation Article ("Transp.) is consistent with Black's Law Dictionary. Transp. § 25-114 prohibits the police from targeting only motorcycles at motor vehicle checkpoints. In that context, "checkpoint" is defined as "a predetermined fixed location at which a police officer stops a motor vehicle or a specific sequence of motor vehicles to conduct safety inspections, inspect drivers' licenses or registrations, or evaluate drivers for impairment." Transp. § 25-114(a). The Transportation Article also draws a distinction between "traffic stops" and "checkpoints." Transp. § 25-113 provides that a "traffic stop" is "any instance when a law enforcement officer stops the driver of a motor vehicle and detains the driver for any period of time for a violation of the Maryland Vehicle Law." Transp. § 25-113(6)(i). However, a "traffic stop" does not include "a checkpoint or a roadblock stop." Transp. § 25-113(6)(ii)(1). Although limited to the context in which it is used, the Transportation Article's definition is not inconsistent with our own.

23

When the light turned red, forcing motorists to stop, officers walked through the intersection to inspect vehicles for visible traffic violations. If a motorist was not wearing his or her seat belt, or was otherwise in violation of the vehicle laws, the motorist was directed by the police to pull around the corner on South Payson Street to receive a citation. Further, Officer Serio testified that not all motorists committing traffic infractions could be stopped, and that once the traffic signal changed to green, motorists were allowed to continue down Pratt Street.

Thus, the police officers conducting the traffic initiative did not create a roadblock. Although police cruisers were present at the traffic initiative, Officer Serio and Officer Dauphin testified that the cruisers were not parked on Pratt Street. Rather, the cruisers were parked around the corner on Payson Street where motorists were issued citations. The police also utilized traffic cones at the traffic initiative, but Officers Serio and Dauphin confirmed that the traffic cones were not used to funnel traffic into a single lane or used to block lanes of traffic. Instead, the traffic cones were placed between parked cars and the curb of Pratt Street for officer safety only. Additionally, the officers conducting the traffic initiative did not impede or direct traffic themselves. The police officers only entered Pratt Street on a red light, and left Pratt Street once the light turned green, even if they spotted a violation. Thus, the officers present did not prevent motorists from using any lane of Pratt Street, funnel traffic to a single lane for easier inspection, or otherwise slow traffic.

Nor were any other indicia of a checkpoint present at the traffic initiative. Signs were not placed ahead of Pratt Street warning motorists of the traffic initiative. The emergency lights on the police cruisers were not activated. Indeed, had these elements been present

24

at the traffic initiative, motorists may have felt obligated to stop or slow down, even if having a green light. But there is no evidence to suggest that, in the absence of these factors, motorists believed they were passing through a police checkpoint.

We are persuaded that the traffic initiative in the case before us was not a checkpoint for purposes of the Fourth Amendment. The officers conducting the traffic initiative did not prevent motorists from proceeding down Pratt Street when they could lawfully do so. Rather, motorists were halted by virtue of a red traffic signal, and only then did police officers enter the crosswalk to observe visible traffic infractions. It was only upon spotting such an infraction that a police officer would effectuate a seizure under the Fourth Amendment. The traffic initiative caused minimal intrusion into the lives of motorists.[7]

Further, the traffic initiative at issue here is almost identical to the police activity at issue in *Skiles*. Absent other authority, we find the reasoning of *Skiles* to be persuasive. Like the officers in *Skiles*, the officers conducting the traffic initiative at issue here used normal traffic conditions—*i.e.*, a red light—to observe traffic violations.[8] Thus, the Baltimore City police officers did not take any "direct action requiring . . . motorists to slow down or stop[;]" rather, the "traffic conditions alone did that." *See Skiles*, 938 S.W.2d at

---

[7] Nor does the traffic initiative rise to the level of unconstitutional conduct that occurred in *Brown v. State*, 78 Md. App. 513, 514 (1989) (A "pre-planned paramilitary operation" in which police officers cordoned off an entire neighborhood of Salisbury, stopped all individuals moving in and out of the neighborhood, asked for identification, and checked for warrants violated the Fourth Amendment.).

[8] In reality, the traffic initiative was comparable to standard traffic observations conducted from the medians of highways. *See Cobey*, 73 Md. App. at 246 ("The police may pull cars over for routine traffic stops from the roadside just as they may while patrolling the highways.").

451. In fact, the traffic initiative was designed in such a way that "there was probable cause to stop every car which was stopped, including that which appellant was driving." *Cobey*, 73 Md. App. at 246. *Cf. Gadson*, 341 Md. at 10 (1995) (A "limited 'seizure' of motorists is permissible even *without individualized suspicion* where the State's interests in conducting the stop outweigh the motorists' interest in avoiding a relatively minor intrusion of their privacy interests.") (emphasis added). Indeed, Johnson has not provided any evidence to the contrary. Therefore, the circuit court did not err in denying Johnson's motion to suppress.

3.

Our next step is to determine if the stop of Johnson was lawful under the Fourth Amendment. We conclude that it was.

The Fourth Amendment to the Constitution, applicable to the states via the Fourteenth Amendment, protects against unreasonable searches and seizures. U.S. CONST. amend. IV; *Ferris v. State*, 355 Md. 356, 369 (1999). A "seizure" occurs whenever an "officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 20 n.16 (1968). This includes detaining a driver in an ordinary traffic stop. *Whren v. United States*, 517 U.S. 806, 809–10 (1996); *see also Little*, 300 Md. 485, 493 ("It is well recognized that stopping an automobile and detaining its occupants constitutes a 'seizure' within the meaning of the Fourth and Fourteenth Amendments to the federal Constitution, even though the purpose of the stop is limited and the resulting detention is quite brief.").

"[S]ubject only to a few specifically established and well-delineated exceptions, a warrantless search or seizure that infringes upon the protected interests of an individual is presumptively unreasonable. *Grant v. State*, 449 Md. 1, 16–17 (2016) (footnote omitted). When a search or seizure is made without a warrant, the government bears the burden of showing some such exception applies. *Id.*

One exception to the Fourth Amendment's "strong preference" for warrants, *Stevenson v. State*, 455 Md. 709, 723 (2017) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)), is for arrests made in public and supported by probable cause. *See Maryland v. King*, 569 U.S. 435, 449 (2013) ("It is beyond dispute that 'probable cause provides legal justification for arresting a person suspected of crime. . . .'") (quoting *Gerstein v. Pugh*, 420 U.S. 103, 113–14 (1975)). Similarly, probable cause is sufficient justification for lesser seizures. A traffic stop, made without a warrant, will be valid if

> the officer has probable cause to believe that the driver has committed a traffic violation . . . or if the officer has reasonable articulable suspicion that criminal activity may be afoot, including reasonable articulable suspicion to believe the "car is being driven contrary to the laws governing the operation of motor vehicles . . . ."

*Smith v. State*, 182 Md. App. 444, 462 (2008) (quoting *Lewis v. State*, 398 Md. 349, 362 (2007) (internal citations omitted). Thus, a police officer's observation of an actual violation of the Maryland Vehicle Law is sufficient basis for a traffic stop. *See Smith v. State*, 214 Md. App. 195, 201 (2013).

In this case, Johnson, halted at the traffic light, was driving without a seat belt in clear violation of state traffic laws.[9] Officer Serio witnessed this violation while walking alongside Johnson's vehicle. This gave the officer sufficient justification to instruct Johnson to pull onto Payson Street so that another officer could issue a citation. Johnson's subsequent inability to provide accurate information regarding his vehicle gave the officers reason to impound the car and conduct the inventory search that, consequently, led to the discovery of the loaded handgun under the driver's seat.

For these reasons, we conclude that the initial stop of Johnson did not offend the Fourth Amendment. The circuit court did not err when it denied Johnson's motion to suppress.[10]

**THE JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY ARE AFFIRMED. APPELLANT TO PAY COSTS.**

---

[9] Transp. § 22-412.3(b) states that "[a] person may not operate a motor vehicle unless the person and each occupant under 16 years old are restrained by a seat belt or a child safety seat as provided in § 22-412.2 of this subtitle."

[10] Because we conclude that there was no Fourth Amendment violation, it is not necessary for us to address the State's alternative contention that the police officers' "immediate discovery of an arrest warrant for Johnson attenuated any illegality associated with the stop." *See, e.g., Utah v. Strieff,* __ U.S. __, 136 S. Ct. 2056, 2061 (2016); *Sizer v. State*, 456 Md. 350, 375–76 (2017); *Cox v. State*, 421 Md. 630, 652–53 (2011).