**Opinion issued August 17, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00608-CR

———————————

**TAIRON JOSE MONJARAS, Appellant**

**V.**

**STATE OF TEXAS, Appellee**

---

**On Appeal from the 232nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1614762**

---

## OPINION ON REMAND

After the trial court denied his motion to suppress evidence, appellant, Tairon

Jose Monjaras, with an agreed punishment recommendation from the State, pleaded

guilty to the felony offense of possession of a firearm by a felon.[1]  In accordance

---

[1]    *See* TEX. PENAL CODE ANN. § 46.04(a), (e).

with the plea agreement, the trial court assessed his punishment at confinement for five years. On original submission, in his sole issue, appellant contended that the trial court erred in denying his motion to suppress evidence.

The Court previously held that the trial court did not err in denying appellant's motion to suppress evidence because the Court concluded that appellant's interaction with law enforcement officers constituted a consensual encounter. *See Monjaras v. State*, 631 S.W.3d 794, 810 (Tex. App.—Houston [1st Dist.] 2021) (*Monjaras I*), *rev'd*, 664 S.W.3d 921 (Tex. Crim. App. 2022) (*Monjaras II*); *but see Monjaras I*, 631 S.W.3d at 810–26 (Goodman, J., dissenting) (concluding interaction between appellant and law enforcement officers ceased being consensual after certain point). Having so held, the Court affirmed the trial court's judgment. *See Monjaras I*, 631 S.W.3d at 810 (modifying trial court's judgment to comport with record and affirming as modified). On original submission, the Court did not address appellant's argument that law enforcement officers lacked reasonable suspicion to detain him. *See id.* at 810 n.4; *but see id.* at 810–26 (Goodman, J., dissenting) (concluding law enforcement officers did not have reasonable suspicion when they detained appellant).

Appellant then filed a petition for review with the Texas Court of Criminal Appeals, which the court granted. *See Monjaras II*, 664 S.W.3d at 926 (granting petition for review "to determine whether the court of appeals erred in finding that

2

[a]ppellant's interaction with the officers was a consensual encounter"). In its decision, the Texas Court of Criminal Appeals concluded that although appellant's interaction with law enforcement officers was initially consensual, it "became an investigative detention." *Id.* at 924–32. It thus reversed this Court's judgment and remanded the case to the Court to determine whether law enforcement officers "had reasonable suspicion to detain [a]ppellant and whether that detention was valid." *Id.* at 924, 932.

We reverse and remand.

## Background

At the hearing on appellant's motion to suppress, Houston Police Department ("HPD") Officer J. Sallee testified that he was on duty, with his partner, on December 12, 2018. While on patrol around noon in a "high crime area," Sallee drove his patrol car into the La Plaza apartment complex on Glenmont Drive. The patrol car's emergency overhead lights and siren were not activated. The weather was warm, in the "[m]id sixties" and "[s]eventies"[2] and Sallee was "looking for obscene crime." As Sallee drove slowly toward the back of the apartment complex, he saw appellant walking. Appellant had a backpack with him. Appellant did not

---

[2]     *Cf. Monjaras v. State*, 664 S.W.3d 921, 924 n.1 (Tex. Crim. App. 2022) (*Monjaras II*) (noting appellant's counsel stated during his closing argument at motion-to-suppress hearing that "the temperature [on December 12, 2018] from 6:00 AM to 12:00 PM ranged from fifty-seven to sixty-eight degrees").

3

make eye contact with Sallee as the patrol car drove by; instead, appellant "immediately looked down as . . . a child would . . . if [he was] doing something wrong." Appellant was "over dressed for th[e] temperature" outside. After the patrol car passed appellant, Sallee's partner saw appellant "immediately look[] up." According to Sallee, this was "not really normal human behavior," but Sallee did not believe that appellant had committed a criminal offense. Sallee also noted that he had never seen appellant before in the area and he had never arrested appellant before that day.

Because Officer Sallee wanted "to see where [appellant] was going or what was going on," he made a U-turn in the patrol car. Sallee still did not activate his patrol car's emergency overhead lights or siren. After the patrol car turned around, Sallee expected to see appellant walking, but appellant was not in sight. Sallee believed that appellant had either "ducked off into an apartment" or run off, but he acknowledged that a number of "different things" could have happened.

While patrolling the other side of the apartment complex, Officer Sallee saw appellant again. Sallee did not activate his patrol car's emergency overhead lights or siren. Sallee stopped the patrol car, exited, and approached appellant to engage in a "consensual encounter" with him. At the time Sallee approached appellant, he did not "suspect him of anything." Sallee requested information from appellant but did not demand information from appellant. Sallee did not exhibit his firearm, and

4

appellant freely spoke to Sallee. Appellant understood what Sallee said to him. Appellant was "free to go," and if appellant "had just taken off running," Sallee would not have done anything.

Officer Sallee also testified that when he eventually searched appellant, he found five .22 caliber bullets in appellant's backpack. According to Sallee, "[t]he only reason[] you have the bullets is [be]cause you have a gun." Sallee then "felt [a] gun" in appellant's waistband when he searched appellant's person. Appellant immediately started fighting with Sallee after Sallee "felt the gun." Sallee believed that appellant was trying to get his firearm when he struggled with Sallee. Following the struggle, Sallee and his partner recovered a firearm from appellant that was "fully loaded."

HPD Officer C. Starks testified that while on duty on December 12, 2018, he rode, along with his partner, Officer Sallee, in a patrol car. While on patrol, Sallee and Starks went to the La Plaza apartment complex on Glenmont Drive. As they drove around the apartment complex, Starks saw appellant walking. When appellant saw the law enforcement officers, he "lowered his head" and did not look at them, which caught Starks's attention because it was not a normal reaction. According to Starks, "[m]ost people look at the marked [patrol car] when [it] drive[s]-by." Starks also stated that appellant was "not dressed appropriately" because it was a "warm

5

day" and appellant was wearing a jacket and a hat. Appellant was carrying a backpack.

After Officers Sallee and Starks passed by appellant in the patrol car, appellant "raised his head." When Sallee turned the patrol car around to drive back toward appellant, he was gone. Starks believed that appellant had "taken off running into the courtyard." Neither Sallee nor Starks activated the patrol car's emergency overhead lights and siren. Starks noted that appellant had not committed a criminal offense at that time, and Starks did not believe that he had ever seen appellant before that day.

When they saw appellant again, Officers Sallee and Starks made a stop to have a consensual encounter with appellant. The manner in which Sallee parked the patrol car gave appellant a "clear path," and Starks testified that appellant was "free to leave." Starks did not exhibit his firearm; he "never grabbed it," "never removed it," and "never took it out of the holster." Starks stayed "back" as Sallee spoke to appellant, and at one point, he walked away to "get a portable fingerprint device." Starks denied "cornering" appellant. If appellant had "taken off running," Starks would have "watch[ed] him take off run[ning]." Starks noted that while Sallee spoke to appellant, another person flagged Starks down to report an incident unrelated to any interaction the officers were having with appellant.

According to Officer Starks, during the officers' interaction with appellant, Officer Sallee asked appellant if he could search him. And later, after appellant's struggle with Sallee, Sallee removed a firearm from appellant's person.

The trial court admitted into evidence, State's Exhibit 1, a copy of the HPD offense report.[3] A portion of the offense report, titled "Case Summary," states:

> Officer . . . Starks and Officer . . . Sallee were patrolling at La Plaza Apartments located at 5909 Glenmont on 12-12-18 in response to an increase in violent crime in the area. The officers noticed [appellant] walking inside of the complex. [Appellant] was heav[ily] dressed with a [backpack] and put his head down as the officers drove by. [Appellant] quickly walked into the courtyard and ran eastbound through the complex. The officers noticed [appellant] exited a breezeway and decided to question him regarding his suspicious activity. . . . Sallee asked [appellant] for his permission to search his person, including his pockets and [appellant] freely agreed to allow . . . Sallee to search him. . . . Sallee found several bullets in [appellant's] backpack during [the] search. . . . Sallee then searched [appellant's] body and touched a .22 caliber handgun concealed inside of [appellant's] pants. [Appellant] grabbed this gun and began to wrestle with [the] officers. [Appellant] grabbed this gun in an attempt to murder . . . Sallee and . . . Starks. The officers wrestled with [appellant] for approximately a minute until . . . Starks tasered him and he began to comply. . . . Sallee recovered a fully loaded . . . . .22 caliber revolver from [appellant]. This [was] a firearm that [appellant] unlawfully possessed because of his felony conviction. . . . Sallee received abrasions to his forehead and hand during th[e] struggle.

---

[3]  *See Perez v. State*, 495 S,W.3d 374, 387 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (appellate court "consider[s] [the] evidence available to the trial court when it ruled on the motion to suppress"); *see also Adroin v. State*, No. 01-15-01062-CR, 2016 WL 7368101, at *2 (Tex. App.—Houston [1st Dist.] Dec. 15, 2016, no pet.) (mem. op., not designated for publication) (appellate courts limit their review of trial court's ruling on motion to suppress "to an examination of the evidence produced at the suppression hearing" unless parties relitigate suppression issue at trial on merits).

Another portion of the offense report written by Officer Sallee states:

> I have made a prior arrest in this same area of Houston for violent gang related crimes while I was assigned to [the] gang division as a crime reduction unit. Officer Starks and I were in a fully marked police Tahoe and were wearing [our HPD] issued uniforms with [body-worn cameras] activated. We entered the La Plaza apartment complex located at 5909 Glenmont Drive.
>
> While [we] were patrolling through the parking lot[,] we passed by [appellant] who was walking east bound, down the southside of the apartment complex. Both Officer Starks and I noticed that [appellant] appeared to be nervous and stared at the ground and only looked up once we passed him. I continued driving a short distance and turned our patrol vehicle around.
>
> We did not see [appellant] once we turned around for a short time and observed him walking down one of the breeze[ways]. Both Officer Starks and I activated our body[-]worn cameras . . . and I made first contact with [appellant].
>
> I introduced myself and shook [appellant's] hand and began speaking with him. After a short conversation[,] I learned that [appellant] did not have any identification on his person. I have seen this many times with fugitives so they can lie about their identity. [Appellant] verbally consented for me to search him. The consent to search can be clearly heard and [seen] on my [body-worn camera]. [Appellant] continued not to make eye contact with me and had trembling hands.
>
> I searched [appellant] once and then moved to his [backpack] where I located approx[imately] 5 unfired .22 caliber bullets. I recognized the bullets to be [for] a .22 caliber pistol [which] is a smaller firearm. I informed Officer Starks that I had found several bullets and told him it would be a smaller pistol that I could have missed. I began searching [appellant] again and felt a gun near his right[-]side groin area. Once [appellant] knew I had found the gun[,] he reached for it and began fighting [with the] officers. I maintained my right hand on the gun and wrapped my left arm around [appellant's] waist. . . . Starks, [appellant,] and I went to the ground after a short struggle on our feet.

8

The entire time [appellant] was attempting to retrieve the gun. Some[how] [appellant] regained his feet and I followed with him by having my arms still wrapped around his waist. We took several steps and I took [appellant] back to the ground. I struck [appellant] several times with my left hand while I maintained my right hand on the gun. . . . Starks regained his feet and was able to deploy his [conducted energy device] striking [appellant] in his upper left shoulder. All while [Starks and I] gave verbal commands to [appellant]. [Appellant] still had his right hand under his body with his hand on the gun. I yelled at [appellant] and . . . Starks recharged the [conducted energy device]. This time [appellant] finally gave up and placed his hands behind his back. . . . I placed [appellant] into hand restraints and retrieved the gun from his waist band. I could see from the side of the revolver that it was loaded and placed it behind me. . . .

And a portion of the offense report written by Officer Starks states:

We drove to the La P[laza] Apartments at 5909/5913 Glenmont and began to drive through the parking lot. There was some activity with a few people walking in the complex.

We drove in southbound from Glenmont, drove to the back of the complex and turned to the west[.] [W]e drove to the west parking lot and turned northbound.

I first saw [appellant] walking southbound on the sidewalk along the side of the apartments. It was a warm morning and [appellant] appeared to be overly dressed wearing what looked like multiple layers of clothing and a knit cap. He was also carrying a backpack. [Appellant] saw us and looked down toward the sidewalk and did not look our way when we passed. [Appellant] then looked forward and continued walking northbound as soon as we passed him.

. . . .

We made a U-turn and then drove back to the south side of the complex.

[Appellant] was [nowhere] to be seen. He had obviously taken off running into the courtyard of the apartments. We lost sight of him.

9

We continued driving eastbound and then turned northbound back toward the entrance that we had just drove through.

Officer Sallee then saw [appellant] walking eastbound through a breezeway into the same parking lot that we were now in.

We decided to do a consensual interview with [appellant] due to his suspicious behavior.

Officer Sallee drove past the breezeway to the north of [appellant]. We stopped in a location that did not impede [appellant's] travel or walking path.

Officer Sallee exited the vehicle and approached [appellant] toward the rear of our truck. . . . Sallee identified himself and shook [appellant's] hand.

[Appellant] told Officer Sallee that he did not have any identification and verbally identified himself during this conversation. [Appellant] was visibly shaking during th[e] interview.

I had exited the vehicle and had neglected to inform the dispatcher of our location. I saw that [appellant] did not have identification. I then walked to the passenger door of our truck and advised the dispatcher of our location and obtained my portable fingerprinting device.

I was walking back around when [a] witness . . . walked up to me wanting to inform me of some type of incident that had occurred overnight.

I instructed her to step away and wait for me on the sidewalk of the apartments.

I heard Officer Sallee ask [appellant] if he could search his person and his pockets. I heard [appellant] freely say yes.

Officer Sallee then searched [appellant's] person and pockets and began to search his backpack while I was fingerprinting him.

Officer Sallee advised that there w[ere] bullets inside of the backpack. I saw these bullets. . . . Sallee then told me that they were .22 caliber bullets and that he wanted to search [appellant] again to make sure that he did not miss a pistol during the original search.

[Appellant] cl[e]nched his hands and stiffened up and then quickly reached for his waistband area.

Officer Sallee then told me that [appellant] had a gun and we both began to struggle with [appellant].

. . . .

We struggled with [appellant] for several seconds. I had a grip on [appellant's] head and hands at one time and lost grip on them during the struggle.

I ended back up on my feet at some time. [Appellant] and Officer Sallee both had their hands on [appellant's] gun and were struggling for several seconds. . . . .

. . . .

I then took out my issued conducted energy device . . . . I told Officer Sallee that I had my taser. The only open spot that I could deploy the conducted energy device [was] on the back of [appellant's] left shoulder.

I activated the [conducted energy device,] and I deployed the trigger until [appellant] stopped trying to pull his gun out to kill us. I released the trigger and [appellant] then began to reach back for his gun. I then re-activated the [conducted energy device] on the same cartridge until [appellant] said something to the effect [of] "I quit" and stopped resisting. I immediately stopped the [conducted energy device] when [appellant] stopped resisting. He was then handcuffed and compliant.

. . . .

Officer Sallee removed the pistol . . . .

11

The trial court also admitted into evidence, State's Exhibit 2, videotaped recordings from the body-worn cameras of Officers Sallee and Starks on December 12, 2018. The videotaped recording from Sallee's body-worn camera shows Sallee driving his patrol car in an apartment complex. Sallee stops the patrol car and states that he is going to initiate a consensual encounter. He exits the patrol car and says to appellant, "Good morning. How you doing, sir?" Sallee introduces himself to appellant and shakes appellant's hand. Sallee stands close to appellant, within arm's reach. Appellant is wearing a jacket, a knit hat, and carrying a backpack over his shoulder. Sallee asks appellant if he lives in the apartment complex. After appellant responds that he does, Sallee asks appellant if he has any "ID." Officer Starks is shown on the videotaped recording standing off to the side near the back of the patrol car and several feet away from Sallee and appellant. Appellant says that his identification is at his home and points in its direction. When Sallee asks appellant for his name, appellant offers to write his name down on Sallee's notepad. Appellant and Sallee move closer so that appellant can take the notepad and a pen from Sallee. Sallee asks appellant "how[] [his] day [is] going," and Starks, while still standing off to the side, asks appellant if he "[is] a painter." Appellant answers the officers' questions. As appellant writes down his name for Sallee, Starks walks away from appellant and Sallee, and Starks is no longer visible on the videotaped recording.

Officer Sallee next asks appellant if he has "ever been arrested." Appellant responds, "Yeah . . . for assault, domestic violence." Sallee also asks appellant to write down his date of birth, which appellant does. While this is occurring, a woman approaches Officer Starks, who reappears on the videotaped recording and moves further away from Sallee and appellant to speak with the woman. Sallee asks appellant if he is nervous and states that appellant is "shaking." Appellant responds. After Starks is finished speaking with the woman, he walks back closer to appellant and Sallee, standing closer to appellant than he was previously. Appellant is now in the middle standing in between the two officers with the patrol car directly in front of him. Sallee asks appellant if he has "anything . . . illegal" on him, including any narcotics or "weapons." Appellant shakes his head "no" in response to Sallee's question. Sallee then asks appellant if he can "search [him]," and appellant starts to empty his pockets. Sallee asks appellant to "hold on" and sticks his hand out, touching appellant's arm, to stop him. Sallee asks again if he can search appellant, and when appellant tries to empty his pockets again, Sallee puts his hand on appellant's arm and tells appellant that he only asked appellant "a question." Sallee then puts his hand on appellant's back, and Starks moves closer to appellant with his hands stretched out, saying "manos, manos."[4] Sallee then asks appellant again, "May I search you," and appellant responds, "Yeah."

---

[4] "'Mano' is the Spanish word for hand." *Monjaras II*, 664 S.W.3d at 925 n.3.

To search appellant, Officer Sallee asks appellant to put his hands on the patrol car for the search. Appellant complies, and Officer Starks takes appellant's backpack off and sets it on the ground by the patrol car. Sallee searches appellant's person. Appellant tells Sallee that he was coming "from work." Sallee then searches appellant's backpack, while Officer Starks stands to the side with appellant and fingerprints appellant. While searching appellant's backpack, Sallee finds bullets. Starks asks appellant if he "ha[s] a gun," and appellant says, "No," and that it is his "painter's backpack." Sallee goes over to appellant to search his person again, telling Starks that the firearm would be "small." Sallee then says, "Yeah, he's got a gun, partner." On the videotaped recording sounds of a struggle can then be heard.

The videotaped recording from Officer Stark's body-worn camera shows Starks riding in the front-passenger seat of a patrol car as it drives through an apartment complex. The patrol car stops, and Starks states, "[F]or [a] consensual encounter." Officer Sallee can be heard saying, "Good morning. How you doing, sir?" Starks exits the front-passenger side of the patrol car and walks around to the back of the car. He stands off to the side behind the patrol car.

The videotaped recording shows Officer Sallee standing with appellant, within arm's reach of appellant. Appellant is wearing a jacket, a knit hat, and carrying a backpack. Sallee asks appellant if he has any "ID." Appellant says, "No," and that he has it at his home. Sallee asks appellant if he can "get [appellant's]

14

name," and appellant agrees. Sallee asks appellant how his "day [is] going," and appellant responds, "Good." Starks asks appellant if he "[is] a painter," and appellant responds, "Yeah." Appellant offers to write his name down on Sallee's notepad and takes the pen and notepad from Sallee's hands.

Officer Starks then walks away from appellant and Officer Sallee and back around the patrol car to open his front-passenger-side door. He gets a device out of the patrol car, and as he walks toward the back of the patrol car again, a woman approaches him. Starks greets the woman. The woman and Starks stand off to the side further away from Sallee and appellant. The woman speaks to Starks about an unrelated incident, and he asks her to wait nearby on the sidewalk. While Starks is speaking to the woman, Sallee can be seen standing right next to appellant, asking appellant if he is nervous and telling appellant that he is shaking.

After speaking to the woman, Officer Starks moves back toward where appellant and Officer Sallee are standing—standing closer to appellant and Sallee than he was previously. Sallee asks appellant if he has "anything . . . illegal" on him, including any narcotics or "weapons." In response, appellant shakes his head, "no." Sallee asks appellant, "May I search you?" And appellant starts removing items from his pockets. To clarify that Sallee is only asking if he can search appellant, Sallee asks appellant to stop taking items out of his pockets and sticks his hand out to stop appellant, touching him. Sallee then places his hand on appellant's arm and

15

asks appellant again, "May I search you?" Sallee then places his hand on appellant's back, and Starks tells appellant, "manos, manos," while stretching out his hand toward appellant. Sallee takes his hand off appellant and asks appellant, "May I go in your pockets and search you." And appellant says, "Yeah." To carry out his search, Sallee asks appellant to put his hands on the patrol car. Appellant complies, and Starks places appellant's backpack on the ground. Sallee searches appellant's person.

After searching appellant's person, Officer Sallee searches appellant's backpack. While this is occurring, Officer Starks asks appellant if he can "see [appellant's] hands" to fingerprint them. Appellant says, "Yeah." Starks asks appellant if he has "ever been arrested before," and appellant responds, "Yeah . . . for domestic violence." Sallee then informs Starks that he found bullets in appellant's backpack. Starks asks appellant if he "ha[s] a gun," and appellant says, "No" and that his backpack is his "painter's backpack." Sallee proceeds to search appellant's person again and tells Starks that the firearm would be "small." Sallee then says, "Yeah, he's got a gun, partner," and a struggle ensues between the officers and appellant.

After the suppression hearing, the trial court denied appellant's motion to suppress evidence.

16

## Standard of Review

We apply a bifurcated standard to review a trial court's denial of a motion to suppress evidence. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review the trial court's factual findings for an abuse of discretion and the trial court's application of the law to the facts de novo. *Id.*; *see also State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008) ("[W]hether a given set of historical facts amount to a consensual police-citizen encounter or a detention under the Fourth Amendment is subject to de novo review because that is an issue of law[—]the application of legal principles to a specific set of facts." (emphasis omitted)). At a suppression hearing, the trial court is the sole trier of fact and judge of the witnesses' credibility, and it may choose to believe or disbelieve all or any part of the witnesses' testimony. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). When, as here, a trial court does not make explicit findings of fact, we review the evidence in a light most favorable to the trial court's ruling, and we assume that the trial court made implied findings of fact that support its ruling as long as those findings are supported by the record. *Ramirez-Tamayo v. State*, 537 S.W.3d 29, 35–36 (Tex. Crim. App. 2017); *see also Walter v. State*, 28 S.W.3d 538, 540 (Tex. Crim. App. 2000). We give almost total deference to a trial court's implied findings, especially those based on an evaluation of witness credibility or demeanor. *Valtierra v. State*,

310 S.W.3d 442, 447 (Tex. Crim. App. 2010).  We will sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case.  *Id.* at 447–48.  This is so even if the trial court gives the wrong reason for its decision.  *Laney v. State*, 117 S.W.3d 854, 857 (Tex. Crim. App. 2003); *State v. Brabson*, 899 S.W.2d 741, 745–46 (Tex. App.—Dallas 1995) (stating, in context of reviewing trial court order granting motion to suppress, appellate court "cannot limit [its] review of the [trial] court's ruling to the ground upon which it relied" and it "must review the record to determine if there is any valid basis upon which to affirm the [trial] court's ruling"), *aff'd*, 976 S.W.2d 182 (Tex. Crim. App. 1998).

## Motion to Suppress

In his sole issue, appellant argues that the trial court erred in denying his motion to suppress evidence because appellant "was detained and in custody from the very second the [law enforcement] officers pretended to have a 'consensual encounter' with him" and "[t]here was no reasonable suspicion for the [investigative] detention."

The Fourth Amendment of the United States Constitution protects against unreasonable searches and seizures.  *Atkins v. State*, 882 S.W.2d 910, 912 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd); *see* U.S. CONST. amend. IV.  Yet, not every encounter between law enforcement officers and citizens implicates

18

constitutional protections. *Hunter v. State*, 955 S.W.2d 102, 104 (Tex. Crim. App. 1997). Interactions between law enforcement officers and citizens are often characterized as either consensual encounters, investigative detentions, or arrests. *State v. Woodard*, 341 S.W.3d 404, 410–11 (Tex. Crim. App. 2011); *Crain v. State*, 315 S.W.3d 43, 49 (Tex. Crim. App. 2010). Arrests require either a warrant or probable cause, while investigative detentions constitute brief seizures that are less intrusive than arrests and only require reasonable suspicion. *Derichsweiler v. State*, 348 S.W.3d 906, 914–17 (Tex. Crim. App. 2011); *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009). Consensual encounters do not trigger any Fourth Amendment protections, so a law enforcement officer does not need probable cause or reasonable suspicion to initiate a consensual encounter. *Woodard*, 341 S.W.3d at 411 (noting "[l]aw enforcement [officer] is free to stop and question a fellow citizen; no justification is required for an officer to request information from a citizen" (internal footnotes omitted)); *State v. Velasquez*, 994 S.W.2d 676, 678–79 (Tex. Crim. App. 1999); *Gaines v. State*, 99 S.W.3d 660, 666 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

Here, the Texas Court of Criminal Appeals held that appellant's initial interaction with Officers Sallee and Starks constituted a consensual encounter. *See Monjaras II*, 664 S.W.3d at 928–29. But it determined that the officers' interaction with appellant subsequently escalated into an investigative detention at a certain

19

point. *See id.* at 929–32. According to the court, at the point during the interaction when "Starks moved very close to [a]ppellant, told [a]ppellant 'manos, manos' while holding his hands out to direct [a]ppellant to follow suit while Sallee had his hand on [a]ppellant's back," an investigative detention occurred. *See id.* at 932. This was because "[a]t th[at] time . . . one officer had his hand on [a]ppellant's back, the other officer was two or three feet in front of [a]ppellant, the patrol car was within four or five feet from one side of [a]ppellant and the apartment complex was approximately twenty-five feet from [a]ppellant's other side," and "[a] reasonable person in [a]ppellant's shoes would not feel free to leave under th[e] circumstances." *Id.*

A law enforcement officer may temporarily detain a person for investigative purposes if the officer reasonably suspects that the detained person is, has been, or soon will be engaged in criminal activity. *See Wade v. State*, 422 S.W.3d 661, 668 (Tex. Crim. App. 2013); *Pate v. State*, 518 S.W.3d 911, 914 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd); *see also Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000) (stating law enforcement officer is generally justified in briefly detaining individual on less than probable cause for purpose of investigating possible criminal behavior if officer has reasonable suspicion). Thus, there must be reasonable suspicion for an officer to conduct an investigative detention. *See Enns v. State*, 612 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2020, no pet.). Here, we must determine whether Officers Sallee and Starks had reasonable suspicion to

20

detain appellant at the time their interaction with him escalated to an investigative detention. *See Monjaras II*, 664 S.W.3d at 932; *see also Judgeware v. State*, No. 01-93-00286-CR, 1994 WL 64869, at *3–5 (Tex. App.—Houston [1st Dist.] Mar. 3, 1994, pet. ref'd) (not designated for publication) (after determining defendant was detained, analyzing whether law enforcement officers had reasonable suspicion).

A law enforcement officer has reasonable suspicion to detain a person if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person is, has been, or soon will be engaging in criminal activity. *Jaganathan v. State*, 479 S.W.3d 244, 247 (Tex. Crim. App. 2015); *Derichsweiler*, 348 S.W.3d at 914. This is an objective inquiry that disregards the subjective intent of the officer and looks, instead, to whether an objectively justifiable basis for the detention existed. *Derichsweiler*, 348 S.W.3d at 914.

When determining whether an officer had reasonable suspicion, we consider the totality of the circumstances. *Id.*; *see also Navarette v. California*, 572 U.S. 393, 397 (2014) ("The standard takes into account the totality of the circumstances—the whole picture." (internal quotations omitted)). "[C]ircumstances may all seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified." *Derichsweiler*, 348 S.W.3d at 914; *see also Woods v. State*, 956 S.W.2d 33, 38 (Tex.

21

Crim. App. 1997) ("[T]he relevant inquiry is not whether particular conduct is innocent or criminal, but the degree of suspicion that attaches to particular types of noncriminal acts."). Whether reasonable suspicion exists depends on "both the content of the information known to the officer and its degree of reliability." *Martinez v. State*, 348 S.W.3d 919, 923 (Tex. Crim. App. 2011). Reasonable suspicion requires more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *see also Munoz v. State*, 649 S.W.3d 813, 819 (Tex. App.—Houston [1st Dist.] 2022, no pet.) ("[T]he officer must have more than an inarticulable hunch or mere good-faith suspicion . . . ."). Notably, the State has the burden to show that a law enforcement officer had at least reasonable suspicion that the defendant had either committed an offense, or was about to do so, before he detained the defendant. *Derichsweiler*, 348 S.W.3d at 913.

The State first argues that Officers Sallee and Starks had reasonable suspicion to believe that "[a]ppellant was engaged in criminal activity" because "Sallee discovered [that] [a]ppellant possessed ammunition" in his backpack. But Sallee did not search appellant's backpack and find the five .22 caliber bullets until after the officers had already detained appellant. *See State v. Duran*, 396 S.W.3d 563, 569–70 (Tex. Crim. App. 2013) ("Information that the officer either acquired or noticed after a detention . . . cannot be considered. A detention is either good or bad at the moment it starts." (internal footnote omitted)); *Paschall v. State*, No.

01-17-00217-CR, 2018 WL 2976120, at *2 n.2 (Tex. App.—Houston [1st Dist.] June 14, 2018, no pet.) (mem. op., not designated for publication) ("We review whether an officer had reasonable suspicion to conduct a detention based on the facts and circumstances known to the officer at the time of the detention."); *cf. Amores v. State*, 816 S.W.2d 407, 415 (Tex. Crim. App. 1991) ("[T]o determine the existence of probable cause, we look to the facts known to the officers at the time of the arrest; subsequently discovered facts or later-acquired knowledge . . . cannot retrospectively serve to bolster probable cause at the time of the arrest."). Thus, the State cannot rely on the bullets found in appellant's backpack to establish that Sallee and Starks had reasonable suspicion to believe that appellant had engaged, or was about to engage, in criminal activity at the time their interaction with appellant escalated to an investigative detention.

The State next argues that Officers Sallee and Starks had reasonable suspicion to detain appellant because "they were patrolling . . . a high crime area," when the officers first saw appellant, he "avoid[ed] eye contact," "[a]ppellant fled from the officers when they first passed him," and he "acted nervously when [they] finally" spoke to him. We review de novo whether the totality of the circumstances gave rise to reasonable suspicion that appellant had engaged, or was about to engage, in criminal activity at the time the officers' interaction with appellant escalated to an

23

investigative detention. *See Wade*, 422 S.W.3d at 668; *see also Madden v. State*, 242 S.W.3d 504, 517 (Tex. Crim. App. 2007).

As to the State's first argument that Officers Sallee and Starks had reasonable suspicion to detain appellant because appellant was in "a high crime area," we note that a person's presence in an area with a high-crime reputation alone is not sufficient to justify a detention. *See Gurrola v. State*, 877 S.W.2d 300, 303 (Tex. Crim. App. 1994); *Sieffert v. State*, 290 S.W.3d 478, 484–85 (Tex. App.—Amarillo 2009, no pet.); *Gamble v. State*, 8 S.W.3d 452, 453–54 (Tex. App.—Houston [1st Dist.] 1999, no pet.); *see also Crain*, 315 S.W.3d at 53 ("Neither time of day nor level of criminal activity in an area are suspicious in and of themselves . . . . Neither fact proves that the suspect is engaged in any sort of criminal offense."); *Sterns v. State*, No. 12-11-00283-CR, 2012 WL 3458096, at *3 (Tex. App.—Tyler Aug. 15, 2012, no pet.) (mem. op., not designated for publication) (defendant's presence in high-crime area does not justify investigative detention).

As to the State's second argument that Officers Sallee and Starks had reasonable suspicion to detain appellant because when the officers first saw appellant, he "avoid[ed] eye contact" as they drove by in their patrol car, Texas courts have held that a person's observation of a law enforcement officer's patrol car, standing alone, is not suspicious. *See Rodriguez v. State*, 578 S.W.2d 419, 419–20 (Tex. Crim. App. 1979) (unreasonable to stop pedestrian "solely because he looks

24

over his shoulder in the direction of a police car"); *Gamble*, 8 S.W.3d at 453–54 ("Standing alone, neither the area's high-crime reputation nor appellant's watching the passing police car would have sufficed to justify a detention."); *Leday v. State*, 3 S.W.3d 667, 672 (Tex. App.—Beaumont 1999, pet. ref'd) ("Merely looking at a police car has been held insufficient to constitute a basis for reasonable suspicion for a detention.").  And neither is a person's action in looking away from a patrol car as it passes by. *See Contraras v. State*, 309 S.W.3d 168, 171–72 (Tex. App.—Amarillo 2010, pet. ref'd) (although defendant looked "quickly . . . to the right, away from the [officers]" as they passed, conduct of defendant did not give rise to reasonable suspicion that defendant was engaged, had engaged, or was about to engage in criminal conduct); *Gonzalez-Gilando v. State*, 306 S.W.3d 893, 895–96 (Tex. App.—Amarillo 2010, pet. ref'd) ("It is not a crime in this State to . . . look away from passing police officers . . . .  A student looking down in the classroom upon the teacher asking a question does not *ipso facto* mean the student committed a misdeed. The same can be said of those who look away from law enforcement officials while driving on the roadway."); *see also Luera v. State*, 561 S.W.2d 497, 498–99 (Tex. Crim. App. [Panel Op.] 1978) (looking straight ahead and not looking at law enforcement officers is insufficient for finding of reasonable suspicion); *Loesch v. State*, 979 S.W.2d 47, 52–53 (Tex. App.—Corpus Christi–Edinburg 1998, no pet.) (no reasonable suspicion where defendant was driving in high-crime area, drove an

25

older car, and did not look at law enforcement officers when he drove past them); *Muñera v. State*, 965 S.W.2d 523, 531 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd) (furtive eye movements and nervousness are not reasonable grounds for suspicion). Further, Sallee testified that the circumstances that occurred before he stopped his patrol car and walked up to appellant did not indicate that appellant had committed a criminal offense.

As to the State's third argument that Officers Sallee and Starks had reasonable suspicion to detain appellant because "[a]ppellant fled from the officers when they first passed him," we note that neither officer actually testified that appellant "fled" from them. Sallee testified that after he initially drove his patrol car past appellant, he wanted "to see where [appellant] was going or what was going on," so he made a U-turn in the patrol car. After the patrol car turned around, Sallee expected to see appellant walking, but appellant was not in sight. Sallee believed that appellant had either "ducked off into an apartment" or run off, but he also acknowledged that a number of "different things" could have happened to appellant. *See State v. Kerwick*, 393 S.W.3d 270, 274 (Tex. Crim. App. 2013) (law enforcement officer's subjective beliefs are not relevant to determination of reasonable suspicion of criminal activity to justify investigative detention); *Hall v. State*, 74 S.W.3d 521, 526 n.6 (Tex. App.—Amarillo 2002, no pet.) (law enforcement officer's "observation was nothing more than an unfounded surmise, conjecture or speculation, and such is not stuff of

26

reasonable suspicion"). Starks testified after Sallee turned the patrol car around to drive back toward appellant, appellant was gone, and Starks believed that appellant had "taken off running into the courtyard." *See Kerwick*, 393 S.W.3d at 274 (law enforcement officer's subjective beliefs are not relevant to determination of reasonable suspicion of criminal activity to justify investigative detention); *see also Hall*, 74 S.W.3d at 526 n.6 ("[Just because the law enforcement officer] considered the practice suspicious does not mean that it was for purposes of a Fourth Amendment analysis."). But neither officer testified that they saw appellant flee. *See United States v. Arvizu*, 534 U.S. 266, 274 (2002) (law enforcement officer's "reliance on a mere 'hunch' is insufficient to justify a[n] [investigatory] stop"); *Terry*, 392 U.S. at 27 (recognizing hunch or speculation is not enough basis for reasonable suspicion); *see also Turner v. State*, No. 05-10-01225-CR, 2011 WL 4953438, at *4 (Tex. App.—Dallas Oct. 18, 2011, no pet.) (mem. op., not designated for publication) (noting law enforcement officer provided no evidence that defendant "was in fact fleeing from the scene").

Further, even if appellant had left the area after seeing Officers Sallee and Starks's patrol car, a person's decision to walk or run away from a patrol car that is merely passing by is insufficient to justify an investigative detention. *See Gurrola*, 877 S.W.2d at 303 ("Mere flight alone does not justify an investigative detention . . . ."); *McKinney v. State*, 444 S.W.3d 128, 133–34 (Tex. App.—San

27

Antonio 2014, pet. ref'd) ("A person running at the sight of a patrol vehicle in [a] high crime area, in and of itself, does not give an officer reasonable suspicion to conduct an investigatory detention."); *Gamble*, 8 S.W.3d at 453–54 (defendant's action in watching patrol car and walking away from it when it turned around did not give rise to reasonable suspicion to detain defendant); *cf. Reyes v. State*, 899 S.W.2d 319, 324–25 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd) ("[F]light *from a show of authority* is a factor in support of a finding that there is a reasonable suspicion that a person is involved in criminal activity." (emphasis added)). And Sallee testified that the circumstances that occurred before he stopped his patrol car and walked up to appellant did not indicate that appellant had committed a criminal offense.

Finally, as to the State's fourth argument that Officers Sallee and Starks had reasonable suspicion to detain appellant because he "acted nervously when [they] finally" spoke to him, nervousness, alone, is not sufficient to establish reasonable suspicion. *See Wade*, 422 S.W.3d at 670–71 (Tex. Crim. App. 2013) (nervousness "is not particularly probative because most citizens with nothing to hide will nonetheless manifest an understandable nervousness in the presence of [an] officer" (internal quotations omitted)); *Hamal v. State*, 390 S.W.3d 302, 308 (Tex. Crim. App. 2012); *see also State v. Tucker*, No. 13-15-00491-CR, 2016 WL 2609310, at *7 (Tex. App.—Corpus Christi–Edinburg May 5, 2016, pet. ref'd) (mem. op., not

designated for publication) (holding law enforcement officer lacked reasonable suspicion even though officer observed defendant's "shaking hands" and "slight nervousness" when he encountered defendant (internal quotations omitted)); *State v. Sastaita*, No. 13-14-00237-CR, 2015 WL 9257068, at *6–7 (Tex. App.—Corpus Christi–Edinburg Dec. 17, 2015, no pet.) (mem. op., not designated for publication) (holding defendant's nervousness and "odd behavior" were insufficient to constitute reasonable suspicion (internal quotations omitted)).

Standing alone, neither the area's high-crime reputation, appellant's decision to look away and walk away as Officers Sallee and Starks passed him in their patrol car, nor appellant's purported "nervousness" when the officers actually spoke to him, gives rise to reasonable suspicion to believe that appellant had engaged, or was about to engage, in criminal activity. *See Gamble*, 8 S.W.3d at 453–54. Nor do these facts give rise to reasonable suspicion when considered in light of the totality of the circumstances testified to by Sallee and Starks.[5] *See id.*

---

[5] We note that Officer Sallee testified that at the time he approached appellant, he did not suspect appellant "of anything," and Officer Starks testified that at the time the officers approached appellant, appellant had not committed a criminal offense. And both officers agreed that appellant was "free to go" at the beginning of their interaction with him. Neither officer testified that they had reasonable suspicion to believe that appellant had engaged, or was about to engage, in criminal activity, until after Sallee found bullets in appellant's backpack—which was after the officers' interaction with appellant had escalated to an investigative detention.

Here, we cannot conclude that Officers Sallee and Starks at the time their interaction with appellant escalated to an investigative detention had reasonable suspicion, based on the totality of the circumstances, to believe that appellant had engaged, or was about to engage, in criminal activity. Thus, we hold that the trial court erred in denying appellant's motion to suppress evidence.

We sustain appellant's sole issue.

## Conclusion

We reverse the judgment of the trial court and remand the case to the trial court for further proceedings consistent with this opinion.

Julie Countiss
Justice

Panel consists of Justices Kelly, Goodman, and Countiss.

Goodman, J., concurring.

Publish. TEX. R. APP. P. 47.2(b).